[No. S133343. Aug. 17, 2006.]

MICROSOFT CORPORATION, Plaintiff and Respondent, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

## COUNSEL

Bill Lockyer, Attorney General, Randall P. Borcherding and Julian O. Standen, Deputy Attorneys General, for Defendant and Appellant.

Frank Katz and Shirley Sicilian for Multistate Tax Commission as Amicus Curiae on behalf of Defendant and Appellant.

Michael P. Boyle, Michael J. Bernard, Kurt A. Lamp; Baker & McKenzie, J. Pat Powers; Preston Gates & Ellis, Reed Smith, James P. Kleier, Brian W. Toman, Charles R. Zubryzcki and John R. Messenger for Plaintiff and Respondent.

Ajalat, Polley & Ayoob, Charles R. Ajalat and Christopher J. Matarese for General Motors Corporation as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Ours is a global economy. In contrast, government and the taxing authority used to fund it are national and local. This geographic disparity generates difficulties when each jurisdiction seeks its piece of the economic pie, a pie generated by economic activity that knows no borders.

The Uniform Division of Income for Tax Purposes Act (UDITPA)[1] attempts to address these problems and fairly assess corporate taxes. Adopted by the District of Columbia and 22 states, including California, it seeks to establish uniform rules for the attribution of corporate income, rules that in theory will result in an equitable taxation scheme—equitable to each jurisdiction, seeking its own fair share, and equitable to the taxpayer, who in the absence of uniform rules faces the prospect of having the same income taxed by two, three, or more different states.

■ The UDITPA's application is not always clear.[2] This case requires us to resolve how the UDITPA should apply to income arising from the redemption of marketable securities, a critical aspect of the operations of the treasury departments of many large corporations, including plaintiff Microsoft Corporation (Microsoft). We conclude (1) the redemption of marketable securities at maturity generates "gross receipts" that are includible in the formula used to calculate a multistate entity's tax, but (2) the Franchise Tax Board (the Board) has met its burden of establishing that, in this instance, an alternate formula should be used to calculate Microsoft's tax.

## THE UDITPA

■ The United States Constitution bars taxation of extraterritorial income. (*Container Corp. v. Franchise Tax Bd.* (1983) 463 U.S. 159, 164 [77 L.Ed.2d 545, 103 S.Ct. 2933] (*Container Corp.*); *ASARCO Inc. v. Idaho State Tax Comm'n* (1982) 458 U.S. 307, 315 [73 L.Ed.2d 787, 102 S.Ct. 3103]; *Barclays Bank Internat., Ltd. v. Franchise Tax Bd.* (1992) 2 Cal.4th 708, 714 [8 Cal.Rptr.2d 31, 829 P.2d 279] (*Barclays Bank*).) However, it permits taxation of "an apportionable share of the multistate business carried on in part in the taxing State" (*Allied-Signal, Inc. v. Director, Div. of Taxation* (1992) 504 U.S. 768, 778 [119 L.Ed.2d 533, 112 S.Ct. 2251]) and grants states some leeway in separating out their respective shares of this multistate income, not mandating they use any particular formula (*Container Corp.*, at p. 164). One constitutional method of apportionment, the unitary business/formula apportionment method, "calculates the local tax base by first

---

[1] Uniform Division of Income for Tax Purposes Act, 7A part 1 West's Uniform Laws Annotated (2002) page 141.

[2] The UDITPA "was adopted by the States primarily to prevent federal legislation in [the area of allocating income among states], and as such, has the aspects of a shotgun wedding." (Keesling, *The Combined Report and Uniformity in Allocation Practices* (1974) in Multistate Tax Com., 7th Ann. Rep. (1974) p. 34.)

describing the scope of the 'unitary business'[3] of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that 'unitary business' between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction." (*Container Corp.*, at p. 165.) The UDITPA is generally based on this method. (*Ibid.*)

■ Under the UDITPA, a unitary enterprise's income is divided into "business income" and "nonbusiness income." (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 518 [106 Cal.Rptr.2d 548, 22 P.3d 324] (*Hoechst*); see Rev. & Tax. Code, § 25120, subds. (a), (d).)[4] With some exceptions, nonbusiness income is generally allocated directly to the taxpayer's domiciliary state. (*Hoechst*, at p. 518; §§ 25123–25127.) In contrast, business income is apportioned among the states according to a formula. The portion of a taxpayer's business income attributable to economic activity in a given state is determined by combining three factors: payroll, property, and sales. (§ 25128.) Each factor is a fraction in which the numerator measures activity or assets within a given state, while the denominator includes all activities or assets anywhere. (§§ 25129, 25132, 25134.) The combination of these fractions is used to determine the fraction of total global business income attributable to the given state. (See *Container Corp.*, *supra*, 463 U.S. at p. 170; *Barclays Bank*, *supra*, 2 Cal.4th at p. 715.)[5] This method provides a rough but constitutionally sufficient approximation of the income attributable to business activity in each state. (*Container Corp.*, at pp. 170, 183–184; *Barclays Bank*, at pp. 718–721.)

■ Only the sales factor is at issue here. The sales factor is a ratio comparing sales in a given state to total sales everywhere. (§ 25134.) Sales are measured by counting a business's "gross receipts." (§ 25120, subd. (e).)

---

[3] "A unitary business is generally defined as two or more business entities that are commonly owned and integrated in a way that transfers value among the affiliated entities." (*Citicorp North America, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1411, fn. 5 [100 Cal.Rptr.2d 509].)

[4] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

[5] During the tax year at issue, 1991, California simply averaged the three fractions:

$$\frac{\dfrac{\text{CA Property}}{\text{Total Property}} + \dfrac{\text{CA Payroll}}{\text{Total Payroll}} + \dfrac{\text{CA Sales}}{\text{Total Sales}}}{3} \times \text{Total Income} = \text{Taxable Income}$$

(*Barclays Bank*, *supra*, 2 Cal.4th at p. 715, fn. 2; former § 25128, added by Stats. 1966, ch. 2, § 7, p. 179 and repealed by Stats. 1993, ch. 946, § 1, p. 5441.) California has since amended the formula to give double weight to the sales factor for most business activity. (§ 25128.)

Increases in in-state gross receipts will lead to a larger fraction, greater apportioned income, and higher tax; conversely, increases in out-of-state gross receipts will lead to a reduction in the fraction attributable to California and a reduction in California tax.

■ The UDITPA contains a relief provision. If application of the foregoing provisions fails to "fairly represent the extent of the taxpayer's business activity in this state," the taxpayer may seek or the Board may impose an alternate method of calculation to achieve an equitable result. (§ 25137.)

FACTUAL AND PROCEDURAL BACKGROUND

Microsoft is an international software company with principal offices in the State of Washington. Microsoft and its worldwide subsidiaries operate as a unitary business. Microsoft's business generates excess operating cash, which its treasury department invests in various short-term marketable securities.[6] Some of these securities Microsoft resells to third parties; others it holds and redeems at maturity. These investments are generally short-term; in 1991, the tax year at issue, approximately 80 percent of investment receipts came from securities held for 30 days or less.

In an amended 1991 California tax return, Microsoft reported the income of its treasury department as business income and the entire amount it received from sales and redemptions of marketable securities, $5.7 billion, as gross receipts. In its audit, the Board accepted the treatment of treasury department income as business income and allowed the inclusion of securities sales as gross receipts, but disallowed the return of capital for securities redemptions. That is, for securities held to maturity, it counted as gross receipts only the price differential between the redemption price and the purchase price. Because redemptions of securities were credited to Microsoft's treasury department in Washington State and contributed to Microsoft's sales factor denominator but not its sales factor numerator, inclusion of the full price in the sales factor would have had the effect of diluting that factor (from roughly 11 percent to 3 percent) and cutting Microsoft's California income tax nearly in half, while inclusion of only the net price differential had the effect of increasing Microsoft's sales factor and its state tax. (See § 25134.)

Microsoft exhausted its administrative remedies without success and filed a refund suit. After a bench trial, the trial court ruled for Microsoft, holding that the entire amount received when Microsoft redeemed its securities at maturity

---

[6] During 1991, these securities included commercial paper, corporate bonds, United States Treasury bills and notes, discount notes, United States money market preferred securities, United Kingdom money market preferred securities, fixed rate auction preferred securities, floating rate notes, loan participations, municipal bonds, and loan repurchase agreements.

counted as gross receipts. The trial court further held that the Board had failed to carry its burden of showing that a section 25137 modification to the formula used to compute Microsoft's tax was necessary to achieve a fair representation of Microsoft's California business.

The Court of Appeal reversed, deciding the case solely on section 25137 grounds. It held that inclusion of Microsoft's securities redemptions in its gross receipts would seriously distort the formula's representation of Microsoft's California business and that the Board's proposed exclusion of the returned capital portion of these redemptions was authorized under section 25137. We granted review.

DISCUSSION

## I. *Redemptions as Gross Receipts*

Microsoft asks us to apply a substantial evidence standard of review to the question whether the full amount or net price difference of its redemptions constitutes gross receipts for purposes of the UDITPA, arguing that both the nature of its investments and the extent of its activity here and out-of-state involve factual issues. We decline. The factual attributes of Microsoft's transactions are undisputed. Similarly, the parties have stipulated to the relevant facts concerning the scope of Microsoft's activities in California and elsewhere. While the parties dispute the proper legal characterization of Microsoft's transactions under the UDITPA, "[t]he application of a taxing statute to uncontradicted facts is a question of law, and this court is accordingly not bound to accept the trial court's findings of fact made from the uncontradicted facts shown in the parties' stipulation and the documentary evidence." (*Communications Satellite Corp. v. Franchise Tax Bd.* (1984) 156 Cal.App.3d 726, 746 [203 Cal.Rptr. 779].)

■ As with any issue of statutory interpretation, we begin with the text of the relevant provisions. If the text is unambiguous and provides a clear answer, we need go no further. (*Hoechst, supra,* 25 Cal.4th at p. 519.) If the language supports multiple readings, we may consult extrinsic sources, including but not limited to the legislative history and administrative interpretations of the language. Where, as here, the Legislature has adopted a uniform act, the history behind the creation and adoption of that act is also relevant. (*Ibid.*)

■ Under section 25120, subdivision (e), " 'Sales' means *all gross receipts* of the taxpayer not allocated [as nonbusiness income] under Sections 25123 through 25127 of this code." (Italics added.) The term "gross receipts" is undefined. Microsoft argues that gross receipts include the entire amount

received upon redemption of a marketable security. The Board argues that gross receipts include only the net difference between the amount received and the original purchase price.

■ We agree with Microsoft that the meaning of "gross receipts" in the UDITPA more naturally includes the entire redemption price of marketable securities. "Gross" implies the whole amount received, not just the amount received in excess of the purchase price.[7] To only consider the net price difference as "gross receipts" is an awkward fit with the statutory language, at best. To the extent the language is ambiguous, we generally will prefer the interpretation favoring the taxpayer. (*Edison California Stores, Inc. v. McColgan* (1947) 30 Cal.2d 472, 476 [183 P.2d 16].)

■ The Board, however, argues that only amounts received as consideration count as gross receipts, only the net price difference is consideration, and thus only the net difference should be treated as a receipt. We disagree. In the purchase of a 28-day Treasury bill at 99 and its redemption at 100,[8] for example, the investor exchanges money now for a larger sum of money in 28 days. The Federal Reserve's consideration is the entire amount it receives now; the investor's consideration is the entire larger, but deferred, amount it receives upon redemption. The transaction occurs because the Federal Reserve views the money it receives now as more valuable than the money it must pay later, while the investor views the money it will receive later as more valuable than the money it has now. The difference between the purchase and redemption price is a measure of either gross income or net receipts, not a measure of consideration. (Cf. *Gray v. Franchise Tax Bd.* (1991) 235 Cal.App.3d 36, 42 [286 Cal.Rptr. 453] [gross income is "the excess of the sales price over the cost of goods sold"]; *MCA, Inc. v. Franchise Tax Board* (1981) 115 Cal.App.3d 185, 197–198 [171 Cal.Rptr. 242] [gross receipts differs from gross income in that the latter subtracts the cost of goods sold].)

While the language of section 25120 supports Microsoft's interpretation, it is not unambiguous and does not by itself preclude either side's proposed interpretation. Thus, we turn to extrinsic interpretive aids.

---

[7] See, e.g., Black's Law Dictionary (8th ed. 2004) pages 722–723 (gross receipts are "[t]he total amount of money or other consideration received by a business taxpayer for goods sold or services performed in a year, before deductions," citing 26 U.S.C. § 448); American Heritage Dictionary (2d college ed. 1982) page 578 (gross means "[e]xclusive of deductions; total"); *County of Sacramento v. Pacific Gas & Elec. Co.* (1987) 193 Cal.App.3d 300, 309 [238 Cal.Rptr. 305] (plain meaning of gross receipts is total amount received, without deduction); section 6012 (defining gross receipts for sales and use tax purposes as "the total amount of the sale or lease or rental price," without deduction for the cost of the property sold).

[8] Prices for securities such as Treasury bills are quoted based on a par value of 100. Thus, a $10,000 Treasury bill sold at 99 would be sold for 1 percent less than the face redemption value of the bill, i.e., $9,900.

The legislative history behind the UDITPA favors Microsoft's position. As in *Hoechst, supra,* 25 Cal.4th at pages 522–523, because the Legislature adopted the UDITPA almost verbatim, we look to the drafting history of the UDITPA. An early version of the UDITPA defined "sales" as "all income of the taxpayer" not otherwise allocated, but this provision was amended to define "sales" instead as "all gross receipts of the taxpayer" not otherwise allocated. (Compare Proceedings of Com. of Whole for UDITPA, transcript of Aug. 22, 1956, p. 5 ["income" definition] with Proceedings of Com. of Whole for UDITPA, transcript of July 9, 1957, p. 28 ["gross receipts" definition].) This amendment suggests the choice of "gross receipts" was intentional and the drafters had in mind a definition of "sales" that encompassed more than just gross income.

Agency interpretation of section 25120 likewise supports Microsoft, albeit in a more limited fashion. (See *Hoechst, supra,* 25 Cal.4th at pp. 523–525 [relying on State Board of Equalization (SBE) decisions to interpret the UDITPA].) Consistent with Microsoft's interpretation of the statute, the SBE has interpreted gross receipts to include the full amount of any redemptions. In *Appeals of Pacific Telephone & Telegraph* (May 4, 1978) [1978–1981 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-858, page 14,907-36 (*Pacific Telephone & Telegraph*), as here, the taxpayer's treasury department invested idle cash in short-term securities such as Treasury bills, government obligations, certificates of deposit, and commercial paper, selling some but holding most investments to maturity. The SBE concluded "the gross receipts from these activities come within the literal definition of 'sales' that are includible in the sales factor." (*Id.* at p. 14,907-42.) However, because the inclusion of sales and redemptions in gross receipts was not a major point of contention or analysis, we do not place great weight on this decision.[9] (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14–15 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

■ In deciding how to apply section 25120, we look as well to the economic reality of the taxed transaction. For purposes of taxation, what matters is substance, not form. "In applying this doctrine of substance over form, the [United States Supreme] Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." (*Frank Lyon Co. v. United States* (1978) 435 U.S. 561, 573 [55 L.Ed.2d 550, 98 S.Ct. 1291].) Thus, we focus on the actual rights and benefits acquired, not the labels used. When we consider the economic reality

---

[9] A second case relied on by Microsoft, *Appeal of Merrill, Lynch, Pierce, Fenner & Smith, Inc.* (June 2, 1989) [1986–1990 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-740, page 25,549 (*Merrill Lynch*), provides no additional support. In *Merrill Lynch,* the taxpayer sold securities and included the entire sale price in its gross receipts. Thus, the case involved sales, not redemptions. Moreover, the Board did not contest the taxpayer's categorization of the entire price as gross receipts, and so the SBE assumed it to be correct.

of a security redemption, it becomes clear Microsoft is correct: "gross receipts" include the entire redemption price.

The key is the similarity between the sale and the redemption of a marketable security. The Board concedes that when an investor sells a marketable security to a third party, the *entire* sale price is includible as gross receipts, just as it would be for the sale of any other tangible or intangible property. But from the perspective of the taxpayer, economically a sale and a redemption are indistinguishable. In the sale of a security one day before maturity, the investor relinquishes the bundle of rights that go with the security in exchange for, let us say, a sale price of 99.98. In a redemption upon maturity, the investor relinquishes the identical bundle of rights on the maturity date for the full par value of 100. From the perspective of the investor's balance sheet, the transactions are identical (the minor price differential aside), notwithstanding that different labels apply. The difference between the transactions exists only with respect to the *other* side of the transaction, that of the recipient: in one case, a third party acquires the same bundle of rights the investor had, and in the other, because the recipient is the original issuer of the security, the security is retired. Because from a tax perspective we are concerned only with the economic activity of the taxpayer/investor, we can discern no reason to treat the two transactions differently. We conclude the full redemption price, like the full sale price, must be treated as gross receipts.

This rule is consistent with the application of "gross receipts" to a wide range of other transactions that include a return of capital. Thus, for example, when a taxpayer enters into a cost plus fixed fee contract, pursuant to which the taxpayer is reimbursed for its outlay of costs and paid a fee in addition, the entire amount received—both the fee and the reimbursed costs—is included in gross receipts. (See Cal. Code Regs., tit. 18, § 25134, subd. (a)(1)(B).)[10] When a taxpayer sells off equipment used in its business—a truck, for example—the entire sale price, not just the sale price less cost of goods and adjustments for depreciation, constitutes gross receipts. (*Id.*, subd. (a)(1)(F).) We see no reason to treat redemptions on maturity differently for gross receipts purposes.

The Board argues, and the Court of Appeal intimated, that differential treatment is justified because in one instance, the sale to a third party, there is a "sale," while in the other there is no sale. This argument promotes form over substance. We care about the nature of the transaction, not the label attached. We use different labels to distinguish a third party sale from a redemption on maturity because, as noted above, for the security's recipient

---

[10] All further references to Regulations are to the California Code of Regulations, title 18, unless otherwise indicated.

the transactions have different consequences. From the perspective of the taxpayer/investor, however, they are identical; hence, from the perspective of tax law, they should be treated identically. Moreover, we note that under Regulation section 25134, subdivision (a)(1), gross receipts include payments arising not just from sales but from "transactions and activity in the regular course of" the taxpayer's business as well. Thus, we place no great emphasis on the significance of the label "sale."

The Board further argues that a sale the day before redemption is different because it carries with it an additional risk of loss—the risk the security might be sold for less than the purchase price. The Board, however, fails to explain why this difference would justify treating a sale and redemption differently for gross receipts purposes, nor do we discern any reason it would.

The Board argues that its position is supported by a different source of administrative interpretation than the agency decisions relied on by Microsoft, to wit, Regulation section 25134, subdivision (a)(1)(A), which includes in gross receipts "all interest income." This means, the Board argues, that by negative implication gross receipts exclude a return of principal. The surrounding text demonstrates the error in this interpretation: "Gross receipts for this purpose means gross sales, less returns and allowances and includes all interest income, service charges, carrying charges, or time-price differential charges incidental to such sales." (*Ibid.*) This subdivision thus includes interest *in addition to* the principal price for any sale of goods or products. It does not support a reading of gross receipts that includes interest but excludes the principal sale price.

The Board also points to two judicial decisions it contends support its interpretation of gross receipts. (*City of Los Angeles v. Clinton Merchandising Corp.* (1962) 58 Cal.2d 675 [25 Cal.Rptr. 859, 375 P.2d 851] (*Clinton Merchandising*); *County of Sacramento v. Pacific Gas & Elec. Co., supra*, 193 Cal.App.3d 300.) In *Clinton Merchandising*, we addressed whether a municipal tax on gross receipts should apply to the principal of intracompany loans made within a family of affiliated corporations. We concluded it should not. (*Clinton Merchandising*, at p. 681.) That decision is of little help. We treated repayment of corporate loans between affiliates as the functional equivalent of a principal reimbursing its agent for monies advanced by the agent. Thus, we held that money collected or paid out by an agent on behalf of its principal did not constitute gross receipts. (*Id.* at p. 682.) Here, we are presented not with intracompany loans between Microsoft affiliates, but receipts from investments made with third parties.

In *County of Sacramento v. Pacific Gas & Elec. Co., supra*, 193 Cal.App.3d at pages 309–312, the Court of Appeal addressed whether a franchise fee

assessed against gross receipts should apply to the intracompany use of gas and electricity and concluded it should not because nothing was received. Like *Clinton Merchandising, County of Sacramento* involved intracompany transactions in which nothing was received from outside the taxed entity. It sheds no light on the proper understanding of gross receipts in the context of payments received from outside Microsoft.

Finally, the Board asks us to follow out-of-state decisions concluding that gross receipts under the UDITPA apply only to the net difference between sale or redemption price on the one hand, and purchase price on the other. However, we find a split of authority. While many courts have adopted the Board's position,[11] others have adopted Microsoft's.[12] On balance, we find the latter cases better reasoned than the former. The progenitor of the former line of cases, *AT&T, supra,* 476 A.2d 800, rests its holding on the notion that interpreting New Jersey's receipts factor to include all receipts from short-term securities investments would produce "absurd results." (*Id.* at p. 802.) The cases following *AT&T* reason similarly. (See *Walgreen Ariz. Drug v. Ariz. Dept. of Revenue, supra,* 97 P.3d at pp. 899–900; *Sherwin-Williams Co. v. Ind. Dept. of State Revenue, supra,* 673 N.E.2d at p. 852.) There are two problems with these "absurd results" cases. First, they do violence to the language of the statutes they interpret. In each case, the same language governs both sales of off-the-shelf products and sales of securities. *AT&T* and its progeny offer no explanation why in one instance that language should require inclusion of gross proceeds and in the other require inclusion of only net proceeds. Second, they overlook the fact no absurd result is required. As the Tennessee Court of Appeals has explained: "With deference to sister jurisdictions, this court is reluctant to apply the same 'absurd result standard.' An absurd result is not necessary for, in spite of the plain language of [the sales factor statute], the commissioner may opt for a different scheme of assessment whenever the resulting apportionment does not fairly represent the taxpayer's business in this state." (*Sherwin-Williams Co. v. Johnson, supra,* 989 S.W.2d at p. 715.) The UDITPA contains an equitable relief provision so that, in cases where application of the statutory sales definition results in excessive distortion, an "absurd result" may be avoided. (See § 25137.)

---

[11] See *Walgreen Ariz. Drug v. Ariz. Dept. of Rev.* (Ariz.Ct.App. 2004) 97 P.3d 896, 899–902; *Sherwin-Williams Co. v. Dept. of Rev.* (Ind.Tax 1996) 673 N.E.2d 849, 851–853; *American Tel. & Tel. Co. v. Taxation Div. Director* (App.Div. 1984) 194 N.J. Super. 168 [476 A.2d 800, 802–803] (*AT&T*).

[12] See *American Tel. & Tel. Co. v. Tax Appeal Bd.* (1990) 241 Mont. 440 [787 P.2d 754, 757–759]; *Sherwin-Williams Co. v. Dept. of State Revenue* (2000) 329 Ore. 599 [996 P.2d 500, 501]; *Sherwin-Williams Co. v. Johnson* (Tenn.Ct.App. 1998) 989 S.W.2d 710, 712–715; *United States Steel Corp. v. Wisconsin Dept. of Revenue* (Appeals Com. 1985) 1985 Wis. Tax Lexis 89, *23–*24.

Nor do we find a legislative consensus over whether in a redemption of securities the full or net price constitutes gross receipts. Some states retain the same partially ambiguous language as California.[13] Other states expressly acknowledge that redemptions generate gross receipts, then exclude them by statute.[14] Still other states define gross receipts in a way that expressly includes only the net gain from redemptions or excludes them entirely.[15] The lack of consensus is even clearer when we consider that some of the foregoing statutes have been amended since 1991, the tax year at issue here. During that year, certainly no legislative consensus obtained as to the treatment of redemptions.

This legislative and judicial division of opinion offers no persuasive reason to reject the interpretation of gross receipts most naturally suggested by the text of the statute, the economic reality of sales and redemptions, and agency interpretation. In any event, there is another way to achieve uniformity, as we discuss in part II., *post.*

II. *Section 25137: Fair Representation of Microsoft's Business Activity*

A. *The scope of section 25137*

 Our conclusion that the full redemption price constitutes gross receipts does not end matters. The UDITPA includes a relief provision for dealing with any unreasonable calculations rote application of the three-factor formula may yield. Section 25137 provides: "If the allocation and apportionment provisions of this act do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the Franchise Tax Board may require, in respect to all or any part of the taxpayer's business activity, if reasonable: [¶] (a) Separate accounting; [¶] (b) The exclusion of any one or more of the factors; [¶] (c) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or [¶] (d) The employment of any other method to effectuate an

---

[13] E.g., Idaho Code section 63-3027, subdivision (a)(5); Kentucky Revised Statutes Annotated section 141.120, subsection (1)(g); Montana Code Annotated section 15-31-302, subsection (5); New Mexico Statutes Annotated section 7-4-2, subdivision (F); North Dakota Century Code section 57-38.1-01, subsection (6); Utah Code Annotated section 59-7-302, subdivision (5).

[14] E.g., Florida Statutes Annotated section 220.15, subsection (5)(a); Massachusetts General Laws, chapter 63, section 38, subdivision (f); Oregon Revised Statutes *section 314.665,* subdivision (6)(a); 72 Pennsylvania Statutes section 7401, subdivision (3)2(a)(1)(E).

[15] E.g., Colorado Revised Statutes section 39-22-303, subdivision (4)(b); Connecticut General Statutes section 12-218, subsection (c)(2)(C)(3); North Carolina General Statutes section 105-130.4, subdivision (a)(7)(d); Rhode Island General Laws section 44-11-14, subdivision (a)(2)(v); Wisconsin Statutes section 71.04, subdivision 7(f)(5).

equitable allocation and apportionment of the taxpayer's income." Here, the Board argues that inclusion of the full price does not fairly represent the extent of Microsoft's business activity in California. As the party invoking section 25137, the Board has the burden of proving by clear and convincing evidence that (1) the approximation provided by the standard formula is not a fair representation, and (2) its proposed alternative is reasonable. (See § 25137; *Colgate-Palmolive Co. v. Franchise Tax Bd.* (1992) 10 Cal.App.4th 1768, 1786 [13 Cal.Rptr.2d 761]; *In the Matter of the Appeal of Crisa Corp.* (June 20, 2002) [2000-2003 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 403-295, pp. 30,352, 30,358 (*Crisa Corp.*).)[16] We agree with the Court of Appeal that the Board has done so.

In language we find persuasive, the SBE has interpreted section 25137 to allow correction of distortions arising from the operation of a large corporate treasury department. In *Pacific Telephone & Telegraph, supra,* Cal.Tax Rptr. (CCH) ¶ 205-858, page 14,907-36, as here, the taxpayer corporate group maintained an out-of-state treasury department that invested in short-term securities. These investments produced less than 2 percent of the company's business income, but 36 percent of its gross receipts.[17] The SBE described the sales factor as intended to "reflect the markets for the taxpayer's goods or services" and asked whether inclusion of all investment receipts would serve that function. (*Id.* at p. 14,907-43.) It answered in the negative: "The inclusion of this enormous volume of investment receipts substantially over-loads the sales factor in favor of New York, and thereby inadequately reflects the contributions made by all other states, including California, which supply the markets for the . . . services provided by [taxpayer]. Moreover, we are unable to accept, even for a moment, the notion that more than 11 percent of [taxpayer's] entire unitary business activities should be attributed to *any* single state solely because it is the center of working capital investment activities that are clearly only an incidental part of one of America's largest, and most widespread, businesses. We conclude, therefore, that UDITPA's normal provisions 'do not fairly represent the extent of the taxpayer's business activity in this state,' and that [the Board] is authorized, under section

---

[16] Both Microsoft and amicus curiae General Motors Corporation erroneously suggest the Board must show " 'the income attributed to that State is in fact "out of all appropriate proportions to the business transacted . . . in that State," [citation], or has "led to a grossly distorted result," [citation].' " (*Container Corp., supra,* 463 U.S. at p. 170.) This is the *constitutional* standard for striking down a tax under the due process and commerce clauses. However, section 25137's application is not confined to correcting unconstitutional distortions. (See *Twentieth Century-Fox Film Corp. v. Department of Revenue* (1985) 299 Ore. 220 [700 P.2d 1035, 1039–1040] [interpreting identical UDITPA relief provision].) The Board need only satisfy the lesser statutory standard quoted in the text.

[17] By comparison, the distortional impact is even greater here; Microsoft's short-term investments produced less than 2 percent of the company's income, but 73 percent of its gross receipts.

25137, to require a deviation from the normal rules." (*Ibid.*) If one substitutes "Washington" for "New York" and "24 percent" for "11 percent," these words are equally applicable to this case.

More recently, in *Crisa Corp., supra*, Cal.Tax Rptr. (CCH) ¶ 403-295, page 30,352, the SBE reiterated that operation of a large treasury department unrelated to a taxpayer's main business is a paradigmatic example of circumstances warranting invocation of section 25137. It included in a non-exclusive list of such circumstances that "[o]ne or more of the standard factors is biased by a substantial activity that is not related to the taxpayer's main line of business. For example, the taxpayer continuously reinvests a large pool of 'working capital,' generating large receipts that are allocated to the site of the investment activity. However, the investments are unrelated to the services provided by the taxpayer as its primary business." (*Crisa Corp.*, at p. 30,360.)

In contrast, in *Merrill Lynch, supra*, Cal.Tax Rptr. (CCH) ¶ 401-740, page 25,549, the SBE rejected application of section 25137. The taxpayer bought and sold securities as its principal business, both as an agent/broker (throughout the country) and as a principal/underwriter (primarily in New York), and included the underlying cost of the securities in its gross receipts. (*Merrill Lynch*, at p. 25,551.) The Board objected to inclusion of full gross receipts for securities bought as a principal/underwriter, but the SBE rejected that argument. The taxpayer's sale of securities on its own account was not qualitatively different from its main business, and the resulting quantitative difference between the standard formula and the Board's proposed formula was on the order of 23 to 36 percent. (*Id.* at p. 25,554.) This case is analogous to *Pacific Telephone & Telegraph, supra*, Cal.Tax Rptr. (CCH) ¶ 205-858, page 14,907-36, not *Merrill Lynch*; here, Microsoft's treasury functions are qualitatively different from its principal business, and the quantitative distortion from inclusion of its investment receipts is substantial.

A salutary effect of the conclusion that section 25137 applies here is that it achieves uniformity, a central goal of the UDITPA. (See *Hoechst, supra*, 25 Cal.4th at p. 526; § 25138 [UDITPA "shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it"]; Keesling & Warren, *California's Uniform Division of Income for Tax Purposes Act, Part I* (1968) 15 UCLA L.Rev. 156, 156.) While there is a nationwide split over whether the return of investment capital is included in gross receipts, those states that do include it and have addressed the further

application of UDITPA's relief provision uniformly allow use of that provision to ameliorate resulting distortions.[18]

In *Sherwin-Williams Co. v. Johnson, supra*, 989 S.W.2d 710, the taxpayer's Ohio treasury department generated short-term investment receipts that exceeded the gross receipts from its principal paint business. The court concluded that, though under the plain language of the UDITPA, as adopted by Tennessee, these investment receipts were gross receipts, UDITPA's relief provision allowed the State of Tennessee to exclude the return of capital from investment receipts in order to cure distortion and fairly represent the taxpayer's activities in and out of state. (*Id.* at pp. 715–716; Tenn. Code. Ann. § 67-4-812, subsection (a) [parallel provision to Cal. Rev. & Tax. Code, § 25137].)

Similarly, in *American Tel. & Tel. Co. v. State Tax Appeal Bd., supra*, 787 P.2d 754, the Montana Supreme Court upheld application of UDITPA's relief provision to short-term investment receipts generated by the taxpayer's New York treasury department. Though these receipts fell within the statutory definition of "sales" as "all gross receipts," their inclusion would skew the results of the standard formula and underallocate income to states outside New York. Consequently, application of the relief provision was appropriate. (*Id.* at pp. 757–759; see Mont. Code Ann. § 15-31-312 [parallel provision to Cal. Rev. & Tax. Code, § 25137].)

The SBE and these sister-state courts implicitly recognize that the problem arising from inclusion of the full sale or redemption price of a short-term security is not that the full price is not gross receipts. Rather, the problem is one of scale: short-term securities investments involve margins (i.e., differences between cost and sale price) that may be several orders of magnitude different than those for other commodities. When a short-term marketable security is sold or redeemed, the margin will often be, in absolute terms, quite small (though of course the *annualized* returns may well be perfectly respectable). Microsoft's treasury activities provide a perfect illustration. Its 1991 redemptions totaled $5.7 billion, while its income from those investments totaled only $10.7 million—a less than 0.2 percent margin. In contrast, its nontreasury activities produced income of $659 million and gross receipts of $2.1 billion, for a margin of more than 31 percent, roughly 170 times greater.

---

[18] Amicus curiae the Multistate Tax Commission, an administrative agency charged with promoting uniform state income tax laws, argues that the overwhelming majority of states exclude from gross receipts the return of capital from short-term investment receipts, but do so in different ways, some by excluding it from the definition of gross receipts, others by concluding that inclusion can be distortive, and urges us to adopt either approach to achieve uniformity. We adopt the latter approach.

This situation, when one mixes apples—the receipts of low-margin sales—with oranges—those of much higher margin sales—presents a problem for the UDITPA. The UDITPA's sales factor contains an implicit assumption that a corporation's margins will not vary inordinately from state to state. This can be seen by examining the statutory formula. Recall the general formula:

$$\frac{\dfrac{\text{CA Property}}{\text{Total Property}} + \dfrac{\text{CA Payroll}}{\text{Total Payroll}} + \dfrac{\text{CA Sales}}{\text{Total Sales}}}{3} \times \text{Total Income} = \text{Taxable Income}$$

(*Ante*, fn. 5; former § 25128, added by Stats. 1966, ch. 2, § 7, p. 179 and repealed by Stats. 1993, ch. 946, § 1, p. 5441.) Setting the payroll and property factors to zero in order to focus on the role of the sales factor gives the following:

$$\frac{1}{3} \times \frac{\text{CA Sales}}{\text{Total Sales}} \times \text{Total Income} = \text{Taxable Income}$$

which is the same as

$$\frac{1}{3} \times \frac{\text{Total Income}}{\text{Total Sales}} \times \text{CA Sales} = \text{Taxable Income}$$

Because (Total Income/Total Sales) is essentially a company's average worldwide margin, this formula in effect estimates the income attributable to a state by multiplying the average worldwide margin by the in-state receipts to approximate the in-state income.

■ This approximation works well enough in the absence of huge variations in state-to-state margins. It also provides a necessary antidote to strictly geographic accounting that may overlook the interdependence of operations across state lines or be susceptible to manipulation. However, modern corporate treasury departments whose operations are qualitatively different from the rest of a corporation's business and whose typical margins may be quantitatively several orders of magnitude different from the rest of a corporation's business pose a problem. Under the UDITPA, the operations and gross receipts of a treasury department are properly attributed to the state where the department operates—here, Washington. (See § 25136.) The nature of these operations means that Microsoft's true margin for its Washington operations will be much, much lower than the worldwide average, and its margin for every other state will be much higher than the worldwide

average.[19] Thus, rotely applying the worldwide average margin (Total Income/Total Sales) to each state's gross receipts would result in severely underestimating the amount of income attributable to every state *except* the state hosting the treasury department, for which state the income would be correspondingly severely overestimated. In such circumstances, rote application of the standard formula does not fairly represent the extent of a taxpayer's activity in each state, except in the rare instance when corresponding imprecision in the payroll and property factors may happen to balance out this distortion.[20]

Microsoft argues that comparison of the income and receipts from its short-term investments in marketable securities against those from the rest of its business activities is a separate accounting analysis foreclosed by our and the United States Supreme Court's previous decisions. We disagree. The analysis suffers neither of the vices we and the United States Supreme Court have condemned; it involves neither a separate jurisdiction-by-jurisdiction accounting that overlooks the interdependence of operations in different jurisdictions (*Container Corp., supra*, 463 U.S. at p. 181; *John Deere Plow Co. v. Franchise Tax Bd.* (1951) 38 Cal.2d 214, 225–227 [238 P.2d 569]) nor a separate entity-by-entity accounting that ignores the interdependence (and non-arm's-length dealing) between members of the unitary group (*Butler Bros. v. McColgan* (1942) 315 U.S. 501, 507–508 [86 L.Ed. 991, 62 S.Ct. 701]; *Edison California Stores, Inc. v. McColgan, supra*, 30 Cal.2d at pp. 479–483). Rather, the analysis simply underscores the qualitative recognition that the different nature of short-term investments means that mixing short-term gross receipts with gross receipts from other types of business activity involves an apples-to-oranges comparison that may require correction.

---

[19] As noted above, Microsoft's 1991 margin for its Washington treasury operations was 0.2 percent, and its margin for its nontreasury operations was more than 31 percent, roughly 170 times greater. Its average worldwide margin (including both elements) was 8.6 percent ($670 million/$7.8 billion).

[20] In an article written shortly after California adopted the UDITPA, John S. Warren, California's representative to the National Conference of Commissioners on Uniform State Laws, which approved the UDITPA, recognized precisely this problem with the sales factor. He posited a scenario in which a company has $1 million in income that, under ordinary application of the three-factor formula, would be split equally between two states, X and Y. It sells a building in state X for $1 million, but the sale generates no income. Inclusion of the $1 million in receipts is technically required by UDITPA's explicit definition of sales and will greatly increase attribution of income to state X, even though the sale has had little or no effect on the company's actual income. In this scenario, Warren and co-author Frank Keesling acknowledged, strict application of the section 25120, subdivision (e) sales definition distorts the proper attribution of income. (Keesling & Warren, *California's Uniform Division of Income for Tax Purposes Act, Part II* (1968) 15 UCLA L.Rev. 655, 669–670 (hereafter Keesling & Warren II).)

 Microsoft further argues that Revenue and Taxation Code section 25137 can apply only to unique, nonrecurring situations. (See Regs., § 25137, subd. (a) ["[Revenue and Taxation Code s]ection 25137 may be invoked only in specific cases where unusual fact situations (which ordinarily will be unique and nonrecurring) produce incongruous results under the apportionment and allocation provisions"].) The frequency with which the issue of large corporate treasury department receipts arises, it contends, renders the issue nonunique and disqualifies this situation from treatment under Revenue and Taxation Code section 25137. Again, we disagree. Systematic oversights and undersights are equally a matter of statutory concern. Nothing in the language of Regulation section 25137 persuades us otherwise. While Revenue and Taxation Code section 25137 "ordinarily" applies to nonrecurring situations, it does not apply only to such situations; the statutory touchstone remains an inquiry into whether the formula "fairly represent[s]" a unitary business's activities in a given state, and when it does not, the relief provision may apply. (See *Crisa Corp.*, *supra*, Cal.Tax Rptr. (CCH) ¶ 403-295, at pp. 30,358-30,360; *Pacific Telephone & Telegraph*, *supra*, Cal.Tax Rptr. (CCH) ¶ 205-858, p. 14,907-36; *Union Pacific Corp. v. State Tax Com'n* (2004) 139 Idaho 573 [83 P.3d 116, 120–121] [applying relief provision to recurring situation, sales of accounts receivables].)[21]

Moreover, as the Board correctly notes, declining to apply UDITPA's relief provision to this type of situation would create a significant loophole exploitable through subtle changes in investment strategy. By shifting investments to shorter and shorter maturities, a unitary group could reduce its state tax liability to near zero, particularly if it placed its treasury department in a state that statutorily excluded the return of investment capital from gross receipts.

## B. *Application*

The stipulated evidence establishes that mixing the gross receipts from Microsoft's short-term investments with the gross receipts from its other business activity seriously distorts the standard formula's attribution of income to each state. These transactions generated minimal income (just

---

[21] Commentators share this view. Professor William J. Pierce, the original drafter of the UDITPA, viewed the sale of intangibles as a problem area and acknowledged, "[T]here are many unusual fact situations connected with this type of income and probably the general provisions of [UDITPA] Section 18 [the relief provision, codified in section 25137] should be utilized for these cases." (Pierce, *The Uniform Division of Income for State Tax Purposes* (1957) 35 Taxes 747, 780.) More generally, he saw section 18 of the UDITPA as necessary to deal with potentially unconstitutional results, but also as a provision that gave "both the tax collection agency and the taxpayer some latitude for showing that for the particular business activity, some more equitable method of allocation and apportionment could be achieved." (Pierce, at p. 781; see also Keesling & Warren II, *supra*, 15 UCLA L.Rev. at p. 675 & fn. 81.)

under 2 percent of Microsoft's business income for 1991) but enormous receipts (approximately 73 percent of gross receipts for 1991). Their inclusion in the standard formula would result in reducing roughly by half the estimated income attributed to California, and likely every state other than Washington, depending on property and payroll factors. The distortion the Board has shown here is of both a type and size properly addressed through invocation of section 25137; application of the standard formula does not fairly represent the extent of Microsoft's business in California. Like the Court of Appeal, we hold the trial court's contrary conclusion was not supported by substantial evidence.[22]

This leaves only the question whether the Board's proffered alternative is a reasonable one. The Board proposes to include in the denominator of the sales factor only the net receipts from Microsoft's redemptions. Because the net receipts are so small in comparison with Microsoft's nontreasury income and receipts, the inclusion of net receipts here is reasonable. If the Board's proposal is reasonable, we are not empowered to substitute our own formula. (See § 25137; *McDonnell Douglas Corp. v. Franchise Tax Bd.* (1968) 69 Cal.2d 506, 514–515 [72 Cal.Rptr. 465, 446 P.2d 313].) We caution, however, that in other cases the Board's approach may go too far in the opposite direction and fail the test of reasonableness. By mixing net receipts for a particular set of out-of-state transactions with gross receipts for all other transactions, it minimizes the contribution of those out-of-state transactions to the taxpayer's income and exaggerates the resulting California tax.[23] If, unlike here, treasury operations provide a substantial portion of a taxpayer's income, this exaggeration may result in an apportionment that does not fairly represent California business activity.

In closing, we note the Court of Appeal's argument that policy reasons favor systematic exclusion of the return of capital from investment redemptions, rather than a requirement that the Board document distortions resulting

[22] Microsoft argues any distortion resulting from inclusion of redemption gross receipts is partially counterbalanced by a distortion resulting from the failure of the standard formula to include intangible property in the property factor. However, Microsoft conceded at trial it was not challenging the Legislature's (and UDITPA's) decision to disregard intangible property when estimating business activity in each state (see § 25129) and, even if we were to assume the omission of intangible property could be a relevant offset, Microsoft failed to establish the extent of any resultant ·distortion. The Board had to establish a source of distortion; having done so, it did not have to disprove the existence of every other conceivable source of distortion.

[23] Consider two sales: a sale for $10 that yields $1 in income in state X, and a sale for $10,000 that yields $1 in income in state Y. If one includes gross receipts from both sales, one concludes that state Y's contribution to sales is 1,000 times greater than state X's. On the other hand, if one corrects for this by including only the net receipts from the second sale—the $1—one concludes that state X's contribution to sales is 10 times greater than state Y's contribution. The truth doubtless lies somewhere in between.

from application of the standard formula on a case-by-case basis. Absent a global redefinition of gross receipts to exclude such returns, smaller distortions insufficient to trigger a reappraisal under section 25137 may slip through the cracks, resulting in underestimation of the tax owed California. This concern may well be valid. Recognizing this problem, numerous other state legislatures have amended their respective income apportionment statutes to expressly exclude investment returns of capital from the definition of gross receipts.[24] Amicus curiae the Multistate Tax Commission has proposed model regulations to likewise exclude investment returns of capital from gross receipts.[25] The Legislature is free to follow these leads.[26] In the absence of legislative action, however, we are not free judicially to amend the UDITPA to achieve this result.

## DISPOSITION

For the foregoing reasons, we affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Moreno, J., Huffman J.,[*] and Hull, J.,[†] concurred.

Appellant's petition for a rehearing was denied October 25, 2006. Chin, J., and Corrigan, J., did not participate therein.

---

[24] E.g., Florida Statutes Annotated, section 220.15, subsection (5)(a); Massachusetts General Laws, chapter 63, section 38, subdivision (f); Oregon Revised Statutes, section 314.665, subdivision (6)(a); 72 Pennsylvania Statutes, section 7401, subdivision (3)2(a)(1)(E); Wisconsin Statutes, section 71.04, subdivision 7(f)(5).

[25] Multistate Tax Commission, Model Regulations, regulations IV.2(a)(5) (excluding return of capital from investment redemption receipts), IV.18(c)(4) (excluding return of capital from investment sale receipts).

[26] Indeed, legislation has been introduced that would prospectively change the treatment of investment returns of capital under the UDITPA. (See Assem. Bill No. 1037 (2005–2006 Reg. Sess.) as amended Aug. 7, 2006, § 1.)

[*] Associate Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[†] Associate Justice, Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.