[No. A052582. First Dist., Div. Five. Nov. 5, 1991.]

DENTAL INSURANCE CONSULTANTS, INC., Plaintiff and Respondent,
v.
FRANCHISE TAX BOARD, Defendant and Appellant.

## COUNSEL

Daniel E. Lungren, Attorney General, and Joyce E. Hee, Deputy Attorney General, for Defendant and Appellant.

Harry J. Kaplan for Plaintiff and Respondent.

## Opinion

**LOW, P. J.**—The State Franchise Tax Board (Board) appeals from the trial court's summary judgment directing that it refund additional franchise taxes and interest paid by Dental Insurance Consultants, Inc., (DIC) for the tax years 1980, 1981, and 1982. The court determined that DIC and its wholly owned subsidiary D.I.C. Farms, Inc., (Farms) were engaged in a unitary enterprise and their net incomes should be combined for franchise tax purposes. We affirm.

Most of the relevant facts are set out in the opinion of the State Board of Equalization from which we quote.

"DIC is a California corporation which provides review and advice regarding dental insurance claims for various insurance companies. Its headquarters is located in Saratoga, California, and it has additional offices in California, several other states, and Canada. Each office has two dentists who coordinate the efforts of dentists who have been engaged, as subcontractors, to assist in reviewing and making recommendations regarding these claims. During the appeal years, DIC enjoyed significant profits.

"The president and majority shareholder of DIC was Richard Guenther. Its vice-president was Ernest Giachetti, and its secretary and treasurer was Harry Kaplan. These men made up DIC's board of directors, and Kaplan also served as DIC's attorney. Farms is incorporated in Nevada, but operates a number of small farms exclusively in California. The Farms' primary crops are oranges, plums, grapes, and jojoba beans.

"Farms was formed by DIC to provide diversification from DIC's dental insurance consulting business. Among DIC's primary motives for diversifying from its main line of business was a concern about increasing competition. The management of DIC also thought that Farms' properties would provide DIC with a hedge against inflation. In terms of Farms' economic viability, DIC concluded that Farms could compete effectively in the farming business because DIC could provide Farms with an unusually consistent cash flow, as a result of DIC's profitability, and the financial expertise of DIC's management.

"Guenther and Kaplan, officers and directors of DIC, were the majority directors of Farms and also served as officers of Farms. Kaplan was Farm's attorney, as well as the attorney for DIC. Barney R. Nielson, the president and remaining director of Farms, was its only employee. The exact limits of Nielson's responsibilities are in dispute, but they consisted, at a minimum, of

investigating business opportunities and presenting them to Farms' board of directors for approval. Ultimate policy decisions, particularly regarding investments and other financial matters, were the responsibility of Farms' board of directors, which, we infer, was [greatly influenced] by Guenther. The daily operations of Farms were conducted by management firms that were unrelated to DIC.

"Farms' basic support functions, such as accounting, bookkeeping, purchasing insurance, and check-writing services, were provided by DIC. DIC made capital contributions to Farms, lent Farms money, and provided guarantees for a number of Farms' obligations. In addition, other creditors apparently relied upon Farms' relationship with DIC when assessing Farms' financial strength. During the appeal years, Farms reported significant losses . . . ." (*Dental Ins. Consultants, Inc.* v. *St. Bd. of Equalization* (Aug. 2, 1989) Cal. Tax Rptr., opn. No. 89-SBE-018, pp. 25,596-25,597.)

I

█ The Board argues that, although unity of ownership exists, DIC and Farms were not sufficiently integrated in their operations, i.e., insurance consultation versus farming, to be considered a unitary business. The Board contends that the existence of interlocking directors and officers and the performance by DIC of some common administrative functions, e.g., accounting, tax preparation, legal, and insurance purchasing, are common to all wholly owned subsidiaries, and do not indicate the necessary interdependence to warrant a conclusion the businesses were unitary.

█ If a taxpayer derives income from sources both within and without California, its franchise tax liability is required to be measured, using an apportionment formula, by the net income derived from or attributable to sources within the state. (Rev. & Tax. Code, § 25101; *Honolulu Oil Corp.* v. *Franchise Tax Bd.* (1963) 60 Cal.2d 417, 425 [34 Cal.Rptr. 552, 386 P.2d 40]; *Edison California Stores* v. *McColgan* (1947) 30 Cal.2d 472, 479 [183 P.2d 16].) The " 'linchpin of apportionability' " is the " 'unitary-business principle.' " (*ASARCO Inc.* v. *Idaho State Tax Comm'n* (1982) 458 U.S. 307, 318-319 [73 L.Ed.2d 787, 796, 102 S.Ct. 3103].) Whether the operations of an interstate subsidiary can be considered "unitary" depends on whether the income from that subsidiary resulted from " 'functional integration, centralization of management, and economies of scale.' [Citation.]" (*F.W. Woolworth Co.* v. *Taxation & Revenue Dept.* (1982) 458 U.S. 354, 364 [73 L.Ed.2d 819, 828, 102 S.Ct. 3128].)

Alternative tests have been developed to answer this inquiry. The seminal case of *Butler Brothers* v. *McColgan* (1941) 17 Cal.2d 664, 667-668 [111

P.2d 334], held that unity is established by the presence of (1) unity of ownership, (2) unity of operation evidenced by central purchasing, management, advertising and accounting departments, and (3) unity of use in the centralized executive force and general system of operations. All three unities must be found to exist. (*Chase Brass & Copper Co.* v. *Franchise Tax Bd.* (1970) 10 Cal.App.3d 496, 501 [95 Cal.Rptr. 805].) Unity is also established if "the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state . . . ." (*Edison California Stores, supra,* 30 Cal.2d at p. 481.) These tests are not mutually exclusive, and application of either to a particular set of facts should result in the same conclusion. Whether the businesses were unitary is a question of law. (*Mole-Richardson Co.* v. *Franchise Tax Bd.* (1990) 220 Cal.App.3d 889, 894 [269 Cal.Rptr. 662].) The taxpayer has the burden of showing the Board's decision was incorrect. (*Consolidated Accessories Corp.* v. *Franchise Tax Board* (1984) 161 Cal.App.3d 1036, 1039 [208 Cal.Rptr. 74].)

A

■ Preliminarily, we note that the Board argues the three-unities test should be abandoned in favor of the United States Supreme Court test of "functional integration, centralization of management, and economies of scale" employed in *F. W. Woolworth Co.* v. *Taxation & Revenue Dept., supra,* 458 U.S. at p. 364 [73 L.Ed.2d at pp. 827-828], and other cases. No choice is compelled, so long as the test used in this state infringes no constitutional rights of out-of-state businesses. (*Honolulu Oil Corp., supra,* 60 Cal.2d at pp. 424-425.) In fact, the Supreme Court in *Butler Bros.* v. *McColgan* (1942) 315 U.S. 501, 508 [86 L.Ed. 991, 996-997, 62 S.Ct. 701], affirmed the use of the three-unities test. Moreover, the State Board of Equalization approved this test in its opinion in this case.

B

■ DIC argues the businesses justified unitary treatment as evidenced by the existence of unity of ownership, financial interdependence, central management and common administrative operations. Unity of ownership is indisputably present. ■ The decisive inquiry is whether these two diverse businesses were sufficiently interconnected in the shared performance of their operational functions and the executive decisionmaking to be treated as a unitary business. No bright line exists to aid in this determination as each case must be decided on its unique business arrangements. ■ We conclude that the common administrative connections between the parent

and subsidiary, and the degree of DIC's oversight of Farms' operations is greater than "the type of occasional oversight—with respect to capital structure, major debt, and dividends—that any parent gives to an investment in a subsidiary . . . ." (*F. W. Woolworth Co., supra*, 458 U.S. at p. 369 [73 L.Ed.2d at p. 831].)

1

*Unity of Operation*

 The categories of unity of operation and unity of use are somewhat artificial, and precise distinctions are therefore impossible, as they often overlap. These descriptions are useful only to the extent they reflect the organizational and economic interrelation between the parent and subsidiary companies. This interrelation must be significant in order to find a unitary business. (Keesling & Warren, *The Unitary Concept in the Allocation of Income* (1960) 12 Hastings L.J. 42, 50-52.)

"Unity of operation" is generally described as the sharing of "staff," or management functions, whereas "unity of use" pertains to "line" functions, or the shared use of personnel and facilities. (*Container Corp. of America* v. *Franchise Tax Bd.* (1981) 117 Cal.App.3d 988, 995 [173 Cal.Rptr. 121], affd. 463 U.S. 159 [77 L.Ed.2d 545, 103 S.Ct. 2933].) Unity of operation is characterized by a centralization of all the major income-producing activities, i.e., management, purchasing, accounting, advertising, personnel, and research and development departments, to name a few.

 Farms' administrative functions were performed by DIC's personnel at DIC's Saratoga headquarters. Farms' bookkeeping, accounting, check writing, legal, and insurance requirements were all performed or paid for by DIC, with an obvious savings to Farms. In *Mole-Richardson Co., supra*, the centralization of similar operational activities for the parent and subsidiary corporations, including accounting, purchasing, advertising, maintenance of personnel records, and processing of payroll and expense payments, was crucial in finding business unity. (220 Cal.App.3d at pp. 892-893, 899; accord, *Edison California Stores, supra*, 30 Cal.2d at pp. 479-480.)

 Substantial intercompany loans also are significant evidence of unity of operation. (*Anaconda Co.* v. *Franchise Tax Board* (1982) 130 Cal.App.3d 15, 26 [181 Cal.Rptr. 640].) As of December 31, 1982, DIC had advanced to Farms a net balance of $1,134,120.77. Although we do not know what portion of the total amount borrowed by Farms this figure represents, it cannot be denied that this is a substantial sum. Moreover, DIC

issued loan guarantees for a number of Farms' obligations. (See *Container Corp. of America, supra,* 117 Cal.App.3d at p. 992 [parent guaranteed about one-third of the loans obtained by foreign subsidiaries].)

Under these facts, unity of operation is established.

2

*Unity of Use*

 This factor is characterized by a centralized executive force and general system of operation. (*Edison California Stores, supra,* 30 Cal.2d at pp. 478-479.)

Evidence of strong centralized management satisfies the agency's own regulations for determining unity. Title 18, section 25120, subdivision (b)(3) of the California Code of Regulations, expressly states that the presence of this factor creates a presumption that the taxpayer's activities constitute a single trade or business: "A taxpayer which might otherwise be considered as engaged in more than one trade or business is properly considered as engaged in one trade or business when there is a strong central management, coupled with the existence of centralized departments for such functions as financing, advertising, research, or purchasing. Thus, some conglomerates may properly be considered as engaged in only one trade or business when the central executive officers are normally involved in the operations of the various divisions and there are centralized offices which perform for the divisions the normal matters which a truly independent business would perform for itself, such as accounting, personnel, insurance, legal, purchasing, advertising, or financing."

 There was significant overlap between DIC's directors and officers and the directors and executives of Farms. In fact, except for Barney Nielson, president of Farms, the officers and directors of Farms also served as officers and directors of DIC.

The stipulated facts establish that ultimate policy decisions of the subsidiary, particularly regarding investments and other financial matters, were the responsibility of Farms' board of directors. Guenther approved all checks issued by Farms, as well as approving the farm managers' decisions to deepen a well, repair wind machines and establish the mix of a product. Guenther also made the decision to plant table grapes at one ranch, and to install a drip irrigation system for certain crops. Guenther also decided to sell one ranch and acquire three other ranches. Guenther maintained weekly

telephone contact with the various farm managers and more frequently during harvest time. Kaplan, an officer and director of DIC, spent a day in Fresno and a day in the Imperial Valley examining the jojoba ranch. Guenther inspected the other ranches once a year during the period between July 1980 and June 1982. Guenther and Kaplan negotiated and executed the farm management and farm consulting agreements. Guenther also made applications for water delivery on behalf of Farms and executed an agreement with the irrigation district regarding the installation of a pump.

The management role played by DIC and Guenther is much more than the occasional oversight any parent routinely gives to an investment in a subsidiary. (Cf. *F. W. Woolworth Co.*, *supra*, 458 U.S. at p. 369 [73 L.Ed.2d at pp. 830-831].) The operational role played by DIC went far beyond that of a passive investor or absentee landlord.

In *Mole-Richardson*, similar oversight by the parent company was used to establish unity among the several business entities. The parent corporation was engaged in the business of design, manufacture, rental and sale of lighting equipment for motion picture and television studios and still photographs. The corporation also owned farm and ranch properties in Colorado, bred and raised cattle and horses, and raced horses. The corporation operated an insurance agency in Colorado which handled ranch and farm insurance. All the stock in the parent corporation were owned by the Parker family. Warren K. Parker was president and chief executive of the corporation.

A subsidiary corporation, owned by the Parker family, owned real property in California and Colorado, none of which was used in the parent's lighting business. Another wholly owned subsidiary was engaged in the rental of motion picture lighting equipment produced by the parent.

Most operational activities, e.g., accounting, purchasing, advertising, etc., were conducted entirely at the parent's corporate headquarters in Hollywood. William Parker supervised all activities of the parent and subsidiary corporations from his Hollywood office. He negotiated the purchase of all the Colorado property and was directly involved in the design and construction of all new buildings in Colorado as well as the ranch irrigation systems. He ordinarily negotiated and approved the purchase of breeding stocks and farm implements and the lease of farm property. He was in daily contact with the Colorado ranch and farm operations, and visited the Colorado properties several times a year. The foreman at the Colorado ranch carried out orders received from Parker. Although Parker's son was ranch manager, he relied at all times on the advice and consent of his father and had no significant

independent authority over ranch operations. (*Mole-Richardson Co., supra*, 220 Cal.App.3d at pp. 892-893.) In concluding the various businesses were functionally integrated, the court relied on evidence that the parent "had a strong centralized management in . . . all major business decisions . . . ." (*Id.*, at p. 899.)

Here, as in *Mole-Richardson*, DIC and Guenther infused large amounts of capital into the subsidiary and exerted significant control and supervision over the management of Farms' properties, even though the daily activities were performed by independent farm management firms. On this record we conclude Farms was not operated independently, but was under the supervision and guidance of DIC. (See *Anaconda Co., supra*, 130 Cal.App.3d at p. 27.) The close control by the parent and the shared administrative functions, coupled with the undisputed unity of ownership, establish the requisite economic, operational and managerial interdependence to establish the unitary nature of these businesses.

## II

The Board argues that the businesses were not functionally integrated as that term was used in *F. W. Woolworth Co.* v. *Franchise Tax Bd.* (1984) 160 Cal.App.3d 1154 [207 Cal.Rptr. 149] (hereafter *Woolworth California*). In that case the Court of Appeal applied the test announced by the United States Supreme Court in *F. W. Woolworth Co.* v. *Taxation & Revenue Dept., supra*, 458 U.S. 354, and preceding cases, that unity depends on whether " ' "contributions to income [of the subsidiaries] result[ed] from functional integration, centralization of management, and economies of scale." ' [*F. W. Woolworth Co.*, [*supra*, 458 U.S.] at p. 364.]" (*Woolworth California, supra*, at p. 1160.)

*Woolworth California* is distinguishable from this case. There, the California court, following the lead of the United States Supreme Court, concluded that the state could not tax income earned by Woolworth of Canada. The court held that "the degree of centralization of management between Woolworth U.S. and Woolworth Canada was no more than could be expected between any parent company and a wholly owned subsidiary." (160 Cal.App.3d at p. 1161.) Both companies have separate administrative departments, and they were operated as distinct business enterprises at the level of full-time management. It was not enough that "there were obvious managerial links between the two companies, including interlocking boards of directors and frequent in-person, mail, telephone and teletype communications between the upper echelons of management, such as would be expected

in the operation of a wholly owned subsidiary by a large parent company. [Citation.]" (*Woolworth California, supra,* at p. 1161.)

Unlike the detached operations and management control of Woolworth of United States vis-à-vis Woolworth of Canada, DIC's executive guidance and financial contributions to Farms' operations went beyond the routine interest of the parent company in the performance and profitability of a wholly owned subsidiary.

The summary judgment is affirmed.

King, J., and Haning, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 30, 1992.