[No. A102915. First Dist., Div. Five. June 8, 2007.]

THE LIMITED STORES, INC., et al., Plaintiffs and Appellants, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

## Counsel

Morrison & Foerster, Paul H. Frankel, Hollis L. Hyans and Carley A. Roberts for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Randall P. Borcherding and Joyce E. Hee, Deputy Attorneys General, for Defendant and Respondent.

## Opinion

**SIMONS, J.**—This matter has been remanded by the Supreme Court (S136922) with directions to vacate our previous decision (*The Limited Stores, Inc. v. Franchise Tax Board* (July 28, 2005, A102915) [nonpub. opn.]) and reconsider the cause in light of *Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750 [47 Cal.Rptr.3d 216, 139 P.3d 1169] (*Microsoft*) and *General Motors Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 773 [47 Cal.Rptr.3d 233, 139 P.3d 1183]. In our earlier decision we affirmed a summary judgment granted in favor of the Franchise Tax Board (FTB). We concluded that the full price of securities held to maturity and redeemed were not properly treated as gross receipts by the taxpayer under the Uniform Division of Income for Tax Purposes Act (UDITPA) (Rev. & Tax. Code, § 25120 et seq.).[1] *Microsoft*, however, reached a contrary result. We vacate our previous decision, and affirm the judgment of the trial court, albeit on a different ground.[2]

### Background[3]

Plaintiffs, The Limited Stores, Inc., and 24 of its affiliated corporations (hereafter collectively The Limited), compose a unitary business[4] that retails within and without California and so is subject to California taxes on its California source income. (§ 25101.) The UDITPA utilizes an apportionment formula to determine the taxes California may appropriately levy on such a business. This formula includes a "property factor," a "payroll factor," and

---

[1] All undesignated section references are to the Revenue and Taxation Code.

[2] Because we are affirming the trial court's grant of summary judgment on a ground different than the one relied upon by the trial court, we provided the parties with an opportunity for supplemental briefing. (Code Civ. Proc., § 437c, subd. (m)(2).)

[3] The factual information in this part is derived from our earlier opinion.

[4] A group of corporations, linked by more than a 50 percent common ownership as set forth in section 25105, are engaged in a unitary business if they share other connections commonly described as "unity of operation" and "unity of use" or as "contribution and dependency." (See *Dental Ins. Consultants, Inc. v. Franchise Tax Bd.* (1991) 1 Cal.App.4th 343, 347–348 [1 Cal.Rptr.2d 757].)

a "sales factor." (§ 25128.) Section 25134[5] provides that the sales factor is a fraction comprised of the taxpayer's total sales in California divided by the taxpayer's total sales everywhere. Section 25120, subdivision (e)[6] defines the term "sales" to mean "all gross receipts of the taxpayer" not allocated as nonbusiness income. The term "gross receipts" is, itself, not defined in the UDITPA.

The Limited sells men's and women's clothing and bath products, is incorporated in Delaware, and has its headquarters and principal place of business in Columbus, Ohio. The Limited's treasury department is located at the Ohio headquarters and conducts all of the retailer's investment activities there. Three employees within the treasury department manage the cash receipts of The Limited's business activities by investing excess cash flow on a daily basis in short-term financial instruments such as commercial paper, certificates of deposit, United States Treasury bills, money market mutual funds, and offshore investments. For each such investment during the relevant period, The Limited received its own money back (return of principal), plus income in the form of either interest or dividends, and then reinvested those funds in similar interest- or dividend-bearing instruments.[7] At least 60 percent of the total proceeds from these investments during the years at issue were derived from financial instruments held for only one day.[8] Over 95 percent of the short-term financial instruments in which The Limited invested during the years in issue were held to maturity and redeemed.

In calculating the sales factor under the UDITPA, The Limited included all money received when these investments matured, including the returns of principal. Pursuant to this calculation, the gross receipts derived from short-term financial instruments added into the sales factor were $12 billion for fiscal year 1993, and $8.3 billion for fiscal year 1994.[9] The FTB disputed this approach and argued only the income received when these investments

---

[5] Section 25134 provides: "The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the taxable year, and the denominator of which is the total sales of the taxpayer everywhere during the taxable year."

[6] Section 25120, subdivision (e) provides: " 'Sales' means all gross receipts of the taxpayer not allocated under Sections 25123 through 25127 of this code."

[7] For purchases of money market mutual funds, the income was received as dividends; for purchases of the remaining investments, the income was received as interest.

[8] During The Limited's fiscal year ending January 31, 1993, 67 percent of the total proceeds derived from financial instruments held for one day and 8.5 percent of the proceeds derived from financial instruments held for 30 days or more. During fiscal year ending January 31, 1994, 60 percent of the total proceeds derived from financial instruments held for one day and 12 percent derived from financial instruments held 30 days or more.

[9] In its postremand supplemental briefing, The Limited abandons its argument that redemption of its offshore deposits should be treated in this fashion. See the discussion in footnote 14, *post*, at page 1501.

matured should be included in the sales factor.[10] Under the FTB approach, the receipts derived from short-term financial instruments added into in the sales factor was $8.3 million for 1993, and $7.6 million for 1994.

Under The Limited's methodology, the gross receipts comprising the denominator of the sales factor totaled $19.3 billion for 1993 and $16.1 billion for 1994. In contrast, under the FTB's methodology, the gross receipts totaled $7.3 billion for 1993 and $7.7 billion for 1994. The Limited's methodology decreased the overall taxation apportionment percentage for California by approximately 21 percent in 1993 (from 8.4208 percent to 6.6508 percent) and 26 percent in 1994 (from 8.9726 percent to 6.6366 percent).

The Limited filed combined unitary returns for 1993 and 1994 using its methodology. After the FTB disputed this action, The Limited exhausted its administrative remedies and filed this action seeking refund of $5.6 million in corporate franchise taxes. In due course, the parties filed cross-motions for summary judgment on the first and second causes of action based on the undisputed material facts summarized above.[11]

On April 11, 2003, the trial court granted the FTB's motion, concurring with the FTB's interpretation of the term "gross receipts" under sections 25120 and 25134. The court determined that The Limited's interpretation would be inconsistent with the purpose of the provision. In light of the court's interpretation of "gross receipts," it did not reach the FTB's alternative argument that section 25137 permits the FTB to use a different method to apportion the revenues of a unitary business when the UDITPA apportionment provisions do not "fairly represent the extent of the taxpayer's business activity in this state." In our first opinion, we agreed with the trial court's analysis and affirmed.

DISCUSSION

## I. Standard of Review

We review summary judgment rulings de novo to determine whether the moving party has met its burden of persuasion that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a

---

[10] In the briefing for the FTB's summary judgment motion and here, the FTB has acknowledged that gross receipts derived from the *sale* of financial instruments occurring *prior to* their maturity are properly included in the sales factor. Conversely, the FTB asserts that the return of principal from financial instruments *held to maturity* may not be included in the sales factor.

[11] The remaining causes of action were settled by the parties.

matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493]; Code Civ. Proc., § 437c, subds. (c), (*o*)(2).) Likewise, we apply the de novo standard of review when, as here, the material facts are undisputed and we must determine whether the trial court properly construed the underlying statutory provisions and applied them to the undisputed facts. (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808]; *Rosse v. DeSoto Cab Co.* (1995) 34 Cal.App.4th 1047, 1050 [40 Cal.Rptr.2d 680].) While the parties dispute the proper legal characterization of The Limited's transactions under the UDITPA, "[t]he application of a taxing statute to uncontradicted facts is a question of law, and this court is accordingly not bound to accept the trial court's findings of fact made from the uncontradicted facts shown in the parties' stipulation and the documentary evidence. [Citations.]" (*Communications Satellite Corp. v. Franchise Tax Bd.* (1984) 156 Cal.App.3d 726, 746–747 [203 Cal.Rptr. 779].) Further, we are not bound by the trial court's stated reasons in support of its ruling; we review the ruling, not its rationale. (*Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

II. *The Entire Redemption Price of Debt Instruments Held to Maturity Is a "Gross Receipt" Under the UDITPA*

The Limited contends that a literal reading of sections 25120, subdivision (e) and 25134 clearly provides for the inclusion of the return of principal from the short-term financial instruments at issue here, and where the language of a statute is plain, the sole function of the courts is to enforce it according to its terms. (*Leroy T. v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665].) Relying upon the "plain meaning" rule and directing our attention to dictionary definitions[12] of the terms "gross" and "receipt," The Limited asserts that all money received from its investment in financial instruments constitutes "gross receipts" of the investments, including the return of The Limited's own principal. The Limited further argues that any perceived uncertainty in the provision must be interpreted in its favor given the customary rule that tax statutes are to be strictly construed against the government. (*County of Los Angeles v. Jones* (1939) 13 Cal.2d 554, 561–562 [90 P.2d 802].)

*Microsoft* is instructive. Microsoft is an international software company and, with its worldwide subsidiaries, operates as a unitary business. Microsoft's

---

[12] We are directed to the Black's Law Dictionary definition of the term "gross" as meaning, in relevant part: "Before or without diminution or deduction. Whole; entire; total; as the gross sum, amount, weight—opposed to net." (Black's Law Dict. (6th ed. 1990) p. 702, col. 2.) Black's Law Dictionary defines "receipt," in relevant part, as "[t]hat which comes in, in distinction from what is expended, paid out, sent away, and the like." (*Id.* at p. 1268, col. 1.)

business generates excess operating cash, which its treasury department invests in various short-term marketable securities. Some of these securities Microsoft resells to third parties; others it holds and redeems at maturity. These investments are generally short-term; in the relevant tax year, approximately 80 percent of investment receipts came from securities held for 30 days or less. As here, Microsoft and the FTB disagreed over the proper treatment under the UDITPA of these redemptions. Microsoft reported the income of its treasury department as business income and the entire amount it received from sales and redemptions of marketable securities, $5.7 billion, as gross receipts. The FTB accepted the treatment of treasury department income as business income and allowed the inclusion of securities sales as gross receipts, but, for securities held to maturity and redeemed, it counted as gross receipts only the price differential between the redemption price and the purchase price. (*Microsoft, supra,* 39 Cal.4th at p. 757.) Because redemptions of securities were credited to Microsoft's treasury department in Washington State and contributed to Microsoft's sales factor denominator but not its sales factor numerator, inclusion of the full price in the sales factor had the effect of diluting that factor (from roughly 11 percent to 3 percent) and cutting Microsoft's California income tax nearly in half, while inclusion of only the net price differential had the effect of increasing Microsoft's sales factor and its state tax. (*Ibid.*; see § 25134.)

After reviewing the statutory language, the legislative history and the economic reality of the taxed transaction, our Supreme Court agreed with Microsoft that the entire amount received when it redeemed its securities at maturity was gross receipts. (*Microsoft, supra,* 39 Cal.4th at pp. 758–762.) Further, the court found that treating the full redemption price as gross receipts was consistent "with the application of 'gross receipts' to a wide range of other transactions." (*Id.* at p. 761.) *Microsoft* vindicates The Limited's position that the full redemption price should be treated as gross receipts.

III.  *Section 25137: The Fair Representation of The Limited's Business Activity in California*

█    The UDITPA includes a relief provision for dealing with any unreasonable calculations required by the strict application of the three-factor formula. Section 25137 provides: "If the allocation and apportionment provisions of this act do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the [FTB] may require, in respect to all or any part of the taxpayer's business activity, if reasonable: [¶] (a) Separate accounting; [¶] (b) The exclusion of any one or more of the factors; [¶] (c) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or [¶] (d) The

employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income." The FTB argues that inclusion of the full redemption price as "gross receipts" leads to an apportionment of income that does not fairly represent the extent of The Limited's business activity in California. As the party invoking section 25137, the FTB "has the burden of proving by clear and convincing evidence that (1) the approximation provided by the standard formula is not a fair representation, and (2) its proposed alternative is reasonable. [Citations.]" (*Microsoft, supra*, 39 Cal.4th at p. 765.)

In *Microsoft*, the Supreme Court relied on decisions of the State Board of Equalization (SBE) to formulate a two-pronged test for deciding whether to apply section 25137. The court concluded, "Microsoft's treasury functions are qualitatively different from its principal business, and the quantitative distortion from inclusion of its investment receipts is substantial" (*Microsoft, supra*, 39 Cal.4th at p. 766) and permitted the FTB to utilize section 25137 to correct distortions arising from treating the full redemption price as gross receipts (*Microsoft*, at p. 765). Applying that same analysis here leads to the same conclusion.

First, we conclude that, like Microsoft, The Limited's treasury functions are "qualitatively different from its principal business." ■ *Microsoft* cited with approval the SBE's conclusion in *In the Matter of the Appeal of Crisa Corp.* (June 20, 2002) [2000–2003 Transfer Binder] Cal.Tax Rptr. (CCH) paragraph 403-295, page 30,352, that "operation of a large treasury department unrelated to a taxpayer's main business is a paradigmatic example of circumstances warranting application of section 25137. [The SBE] included in a nonexclusive list of such circumstances that '[o]ne or more of the standard factors is biased by a *substantial activity that is not related to the taxpayer's main line of business*. For example, the taxpayer continuously reinvests a large pool of "working capital," generating large receipts that are allocated to the site of the investment activity. However, the investments are unrelated to the services provided by the taxpayer as its primary business.' " (*Microsoft, supra*, 39 Cal.4th at p. 766; see *Sherwin-Williams Co. v. Johnson* (Tenn.Ct.App. 1998) 989 S.W.2d 710, 714–716 [the company's treasury department generated short-term investment receipts exceeding the gross receipts of its principal business, the manufacture and sale of paint. The UDITPA's relief provision enabled Tennessee to exclude the return of capital from investment receipts in order to fairly represent the company's business activities]; *Am. Tele. & Tele. v. State Tax Appeal* (1990) 241 Mont. 440, 444–448 [787 P.2d 754, 757–759] [same].) The Limited's treasury functions, too, are qualitatively different from its principal business, the retail sale of apparel and other products. Further, including the full redemption price as "gross receipts" means that the gross receipts produced by three people in

The Limited's treasury department in Ohio exceed the gross receipts from the hundreds of stores throughout the country selling the company's principal products.

The Limited argues, however, that the appropriate test is whether the treasury activities were "a fundamental segment" and "not 'an incidental part of' " the taxpayer's business. Based on the "consistent year-to-year cyclical need to use the cash flows managed by the treasury function for purchasing its seasonal retail inventory," The Limited's "treasury function was an integral and fundamental segment of the retail operations, including the California retail operations, and any factual premise that the treasury operations were ancillary to and not a fundamental segment of The Limited's core retail operations is simply wrong."[13]

We disagree. The function performed by The Limited's treasury function is no different from the one performed by Microsoft's. For each company, the treasury invests excess funds in short-term marketable securities to increase corporate revenue. (*Microsoft, supra,* 39 Cal.4th at p. 757 & fn. 6.) Whether or not this revenue is used to complement the company's primary business is not the test imposed by *Microsoft,* nor should it be. It is almost always true that a treasury department's revenue production will be utilized to support or enhance the company's primary business. The qualitative test adopted in *Microsoft* would be illusory if The Limited's interpretation of it were adopted.

The Limited compares itself to the taxpayer in *Appeal of Merrill, Lynch, Pierce, Fenner & Smith, Inc.* (June 2, 1989) [1986–1990 Transfer Binder] Cal.Tax Rptr. (CCH) paragraph 401-740, page 25,549 (*Merrill*), but *Microsoft*'s analysis of *Merrill* undermines this contention. In *Merrill,* the SBE had examined the taxpayer's sale of securities for its own account, which was conducted primarily in New York, and properly concluded that this aspect of its business "was not qualitatively different from its main business," the buying and selling of securities as a broker for others, which was conducted throughout the country. (*Microsoft, supra,* 39 Cal.4th at p. 766.) The investment in short-term securities here, however, is qualitatively different from The Limited's retail operations.

*Microsoft* also addressed the quantitative factor and commented favorably on *Appeals of Pacific Telephone & Telegraph* (May 4, 1978) [1978–1981

---

[13] In a footnote, The Limited states that the role of the treasury in its "core retail operations" was not an issue developed factually or legally at the trial court and suggests further trial court proceedings "may be" required to develop the necessary facts. We disagree. In the trial court the FTB relied upon section 25137. Moreover, the SBE case law interpreting this provision, cited with approval in *Microsoft,* had been decided before the trial court proceedings in this matter. No remand to the trial court is appropriate.

Transfer Binder] Cal.Tax Rptr. (CCH) paragraph 205-858, page 14,907-36 (*PacTel*), where the SBE determined that including the full price for the redemption of the company's short-term securities distorted the extent of the company's business activities in California. "These investments produced less than 2 percent of the company's business income, but 36 percent of its gross receipts." (*Microsoft, supra,* 39 Cal.4th at p. 765, fn. omitted.) " 'The inclusion of this enormous volume of investment receipts substantially overloads the sales factor in favor of New York, and thereby inadequately reflects the contributions made by all other states, including California, which supply the markets for the . . . services provided by [taxpayer]. Moreover, we are unable to accept, even for a moment, the notion that more than 11 percent of [taxpayer's] entire unitary business activities should be attributed to *any* single state solely because it is the center of working capital investment activities that are clearly only an incidental part of one of America's largest, and most widespread, businesses.' " (*Id.* at p. 765.) *Microsoft* observed, "By comparison [to *PacTel*], the distortional impact is even greater here; Microsoft's short-term investments produced less than 2 percent of the company's income, but 73 percent of its gross receipts." (*Microsoft,* at p. 765, fn. 17.) The distortion in our case is greater still. In 1993, The Limited's short-term investments produced less than 1 percent of the company's business income, but over 62 percent of its gross receipts. In 1994, The Limited's short-term investments produced less than 1 percent of the company's business income, but over 52 percent of its gross receipts. The effect of this is to significantly understate California's contribution as a market for The Limited's retail sales.

*Microsoft* noted that the problem that arises from including the full redemption price of a short-term security relates to the margins, that is, the difference between cost and sale price. When a short-term marketable security is sold or redeemed, the margin is often quite small. For example, Microsoft's redemptions in 1991 "totaled $5.7 billion, while its income from those investments totaled only $10.7 million—a less than 0.2 percent margin. In contrast, its nontreasury activities produced income of $659 million and gross receipts of $2.1 billion, for a margin of more than 31 percent, roughly 170 times greater." (*Microsoft, supra,* 39 Cal.4th at p. 767.) Ignoring this difference distorts the level of business activity in every state, to the disadvantage of all states that do not host the treasury department. (*Id.* at pp. 767–768.) It is noteworthy that the difference in the margins for The Limited's principal business and its treasury functions is even more dramatic. In 1993 and 1994, the company's redemptions totaled approximately $20 billion, while its income from these transactions was approximately $16 million. This is a margin of less than 0.1 percent. From the sale of tangible property in 1993 and 1994, The Limited had $14.5 billion in gross receipts and $6.7 billion in income, a margin of over 46 percent, roughly 460 times greater.

The Limited argues that *PacTel* should be distinguished and states that in *PacTel*, the SBE determined that section 25137 was triggered because "inclusion of the [gross] receipts in issue caused the 'formula to assign to New York at least one-ninth (or about 11 [percent]) of the Bell System's entire business activities' resulting in distortion under section 25137." Here, however, The Limited argues that the distortion is less, approximately 9.25 percent during the challenged period. Assuming, without deciding, that only 9.25 percent of gross receipts are attributed to Ohio as a result of The Limited's treasury activities, that attribution creates a distortion large enough to trigger section 25137.[14] Like the SBE in *PacTel*, " 'we are unable to accept . . . the notion that more than [9] percent of [a retailer's] entire unitary business activities should be attributed to *any* single state solely because it is the center of' " investment activities, without regard to any retail sales in that state. (*Microsoft, supra*, 39 Cal.4th at p. 765.)

Finally, The Limited argues the alternative calculation proposed by the FTB is not reasonable. The FTB proposes including in the sales factor denominator only the net receipts from The Limited's redemptions. *Microsoft* approved this identical proposal, holding, "Because the net receipts are so small in comparison with Microsoft's nontreasury income and receipts, the inclusion of net receipts here is reasonable. If the [FTB's] proposal is reasonable, we are not empowered to substitute our own formula. [Citations.]" (*Microsoft, supra*, 39 Cal.4th at p. 771.) As discussed above, in *Microsoft* the net receipts from its treasury activity was $10.7 million, while its nontreasury activities produced income of $659 million and gross receipts of $2.1 billion. For The Limited, during the two-year period at issue, its treasury produced income of $16 million, while its nontreasury activities produced $6.7 billion in income and $14.5 billion in gross receipts. Under *Microsoft*, the FTB's proposed alternative is reasonable.[15]

---

[14] The 9.25 percent figure utilized by The Limited is premised on the taxpayer's argument that its offshore deposit investments "may be analogous to a secured loan, in which case the return of principal is not treated as gross receipts for sales factor purposes." The FTB points out that throughout this proceeding, The Limited had argued a contrary position—that the redemption of offshore deposits permitted inclusion of the return of principal in gross receipts.' The FTB argues that the taxpayer is judicially estopped from adopting a new legal theory on remand that is contrary to its legal position throughout the case. (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 [70 Cal.Rptr.2d 96].) Because we believe that the 9.25 percent attribution conceded by The Limited is sufficient to trigger section 25137, we need not resolve the judicial estoppel argument.

[15] In its supplemental briefing, The Limited argues that using the "*PacTel* distortion analysis in *Microsoft* . . . would cause the alternative apportionment formula [proposed by the FTB] to assign to Ohio, The Limited's corporate headquarters, . . . less than [one-fourth] of 1 percent, on average, of The Limited's *entire* business activities . . . [and] most certainly goes 'too far in the opposite direction and fail[s] the test of reasonableness.' (*Microsoft, [supra,* 39 Cal.4th] at

### DISPOSITION

The judgment of the trial court is affirmed. Respondent shall be awarded costs on appeal.

Jones, P. J., and Gemello, J., concurred.

---

p. 771.)" But this argument seems to ignore the fact that the small percentage cited reflects only the treasury activities in Ohio and that state will also receive credit for any nontreasury gross receipts generated there.