Filed 2/27/23  P. v. Grizzle CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079679 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD267438) |
| ELLIOTT SCOTT GRIZZLE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura W. Halgren, Judge.  Affirmed.

Nancy Olsen and Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Eric A. Swenson, Alan L. Amann, and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

In 2016, Elliott Scott Grizzle participated in a home invasion that led to the death of one of the home's occupants. A jury convicted him of felony murder (Pen. Code,[1] §§ 187, subd. (a), 189), two counts of first degree robbery in concert with two or more other people in an inhabited dwelling (§ 211) and burglary (§ 459), and made several true findings. In 2021, Grizzle filed a petition for resentencing, contending he was not the actual killer, did not aid, abet, or assist the actual killer with the intent to kill, and he was not a major participant or did not act with reckless indifference to human life. Following an evidentiary hearing, the trial court found the People met their burden of proving beyond a reasonable doubt that Grizzle was a major participant in the underlying felonies, and he acted with a reckless indifference to human life. Accordingly, it denied his petition for resentencing.

Grizzle contends that because he exercised his right to a jury trial, he was ineligible for resentencing under section 1172.6 (formerly section 1170.95)[2] only if a jury and not the court found he was a major participant in the underlying felonies and acted with reckless indifference to human life. He separately contends that substantial evidence does not support the trial court's conclusion that he was a major participant who demonstrated a reckless indifference to human life. We conclude his contentions lack merit, and we affirm the denial of his section 1172.6 petition.

---

[1]     Further unspecified statutory references are to the Penal Code.

[2]     Assembly Bill No. 200 (Stats. 2022, ch. 58, § 10) renumbered section 1170.95 to 1172.6, effective June 30, 2022.

# I.

## BACKGROUND AND PROCEDURAL FACTS

### The Underlying Crime

We take the following statement of facts from our opinion in Grizzle's direct appeal, *People v. Grizzle* (Feb. 27, 2019, D072975, [nonpub. opn.]):

"On May 11, 2016, B.A. and his housemates, B.W., W.S., S.P., and J.P. resided on Tommy Drive in San Diego (Tommy Drive residence). On the afternoon of May 11, S.P. returned to the house after doing some grocery shopping. His housemates were not at home. S.P. brought the groceries inside the house, set them down in the kitchen, went into the 'back living room' at the rear of the house, and checked his phone for a text message.

"S.P. heard the front door open, and a group of three to five men walked through the door in a single file. The man in front pointed a gun in S.P.'s face and told him to lie down on the ground with his hands behind his back. S.P. described the gunman as being in his late 30's or early 40's, six-feet tall, not much hair on his head, and clean shaven.[3] He could not describe the other men.

"The men asked S.P. questions about everyone who lived in the house, such as what their schedules were, what jobs they had, and what cars they drove. The men were especially interested in B.A. The men also asked about large amounts of money and marijuana. S.P. told them that he did not know anything about drugs or money because he never saw anything like that in the house.

"S.P. could hear the men going through the house, ransacking it. He knew there were at least three men in the house because he could hear two men whispering to each other while someone else was going through the

---

3       "At trial, S.P. confirmed that Grizzle was not the gunman."

house.  He heard the men taking the TV off the wall of the back living room. At some point, the men took his cell phone and the keys to his car.

"After about 45 minutes to an hour, the men stood S.P. up, covered his face with some type of cloth, and moved him from the back living room to the adjoining 'front living room.'  S.P.'s hands were restrained with some PlayStation cords and painter's tape.  After S.P. was moved, he heard the men continue to go through the house.  He heard the TV slam on the ground and heard one of the men say, 'We're not going to be taking that with us.'

"Eventually, B.W. came through the front door.  When B.W. entered the house, a man put a gun to his head and ordered him to get on the ground. After B.W. went to the ground, he was hit in the back of the head with the gun, and a T-shirt was placed over his head.  B.W. believed there were four or five men in the house although he only saw the gunman.  The men immediately asked B.W. where B.A. was, about the location of the money and marijuana, and who lived there.  The men took B.W.'s credit cards, his identification, the keys to his Cadillac Escalade, and his cell phone.  B.W. told the men his ATM personal identification number (PIN), and then someone left the house.

"B.W.'s hands were bound with tape and a PlayStation cord.  Initially, B.W. was on the ground near the front door, but then he was moved several feet into the front living room, close to a computer desk.  He heard someone at the computer desk, rummaging through the paperwork and asking

questions about B.A.'s papers. He also heard rummaging throughout the whole house and the garage.[4]

"At one point, one of the men said something like, "Larry said it's wrong" regarding the ATM PIN number. When the man or men who left the house returned, a gun was put to B.W.'s head again because the men thought that B.W. had given them the wrong PIN number. B.W. insisted that he gave them the right number and suggested that they had tried to take out too much money. Someone asked B.W. if he had ever dug a ditch.

"S.P. heard the men eating cereal and opening candy. The men asked S.P. if the beer in the refrigerator was nonalcoholic. S.P. heard a beer bottle being opened and heard somebody drinking liquid. B.W. heard the opening of beer bottles (perhaps two) and heard the men say that they had never had that type of beer before. Both S.P. and B.W. also heard someone 'roasting' drugs. There was no smell of marijuana. S.P. thought the men were smoking methamphetamine. B.W. thought that the man doing drugs was at the computer desk.

"About an hour after B.W. arrived at the house, B.A. walked through the front door. There was a struggle, and a man said, 'Hey, [B.A.], how you doing? We've been waiting for ya.' The men then asked about money, the 'grow,' and whether B.A. had any storage units. B.A. said that all he had was

---

4    "Photographs taken inside the Tommy Drive residence show that the house was ransacked: throughout the house and garage, cabinet doors were left open, drawers were pulled out, and items were strewn all over the floor. Multiple pieces of luggage were left in the kitchen. A garment bag full of clothes was found on a couch in the back living room. A large flat screen TV was resting on a couch in the front living room. Under a pile of items in the hallway, officers discovered a pillowcase that contained a couple of clear plastic baggies of marijuana, a cell phone, an iPad, several credit cards belonging to B.A., and a credit card and California identification belonging to B.W. A bag of marijuana was left behind the front door."

the little sprouts in the backyard and what was in a shoebox.  The men questioned B.A. for several more minutes.  Then there was another struggle, followed by four to six gunshots.

"S.P. did not hear any noise after the gunshots, and, after a moment, took the cover off his eyes.  He found B.W. and helped him get free of his restraints.  S.P. and B.W. searched the inside of the house and then went outside, where they saw B.A. lying face first on the side of the driveway.  S.P. turned B.A. over and saw that he had been shot, blood was pumping out everywhere as B.A. was gasping for breath.  S.P. tried to render aid while B.W. went to find a neighbor to call 911.  Eventually, a police officer arrived at the house.

"A neighbor, who lived one block away from the house, heard two pops that sounded like gunshots a little before 3:00 p.m.  He walked into his backyard to investigate but did not see anything.  He turned around to go back in his house and then he heard somebody scream, 'Help me.'  He looked down over his fence and saw a man without a shirt roll another man over onto his back on the driveway.  The neighbor ran back into his house to call 911.  The neighbor saw another man in a blue shirt come out of the house and saw one of the men performing CPR on the man on the ground.  The police arrived three to four minutes later.

"B.A. was shot three times. He suffered scrapes on the left side of his face, right arm, left wrist and hand, left shoulder, and left knee.  B.A. died from a gunshot wound to his thorax.

"Four bullet casings were recovered from the Tommy Drive residence.  One casing was in the threshold of the front doorway, another was just inside the front door, and two were found in the front living room.  Two bullets were identified at the crime scene: one was in the wall of the entryway, and the

6

other was found underneath B.A. when he was turned over for examination. During B.A.'s autopsy, a damaged bullet was recovered from B.A.'s left buttock, and an additional bullet was recovered from B.A.'s left arm.

"Criminalist Lisa Wilson examined the four casings and concluded that all the cartridges were 9-millimeter Luger caliber and were all fired by the same gun, a pistol. Wilson also performed examinations of the three bullets and concluded that they were fired by the same gun as well.

"Criminalist Adam Dutra inspected the crime scene and performed a firearm trajectory test. Dutra determined that one bullet originated from inside the living room, struck the north wall of the front living room, traveled downwards in a northeast direction, exited the adjacent west wall of the entryway, crossed the entryway, and entered the east wall of the entryway, where it became lodged. Another bullet impacted the edge of the front door just above the strike plate and entered the door, tearing apart the wood and exterior surface of the door. The door had to have been open for that damage to occur. The trajectory of the bullet was from the interior edge of the door to the exterior edge of the door, as if it was exiting the home.

"Dutra concluded that at least three shots occurred inside the house. Two shots were likely fired in the front living room, and a third one was fired either toward the east side of the living room or in the entryway. Based on the position of the bullet wound to B.A.'s hip/buttock area and the damage to the bullet that was removed from his buttock, the bullet that struck his hip/buttock was the same one that went through the edge of the door. B.A. would have been in the threshold of the door when he was struck.

"Police obtained surveillance footage from a U.S. Bank location less than a mile away from the Tommy Drive residence. The footage, which was captured at about 2:00 p.m. on May 11, showed a man driving B.W.'s black

7

Escalade through the drive-thru and using the ATM machine but not taking out any money. Records for B.W.'s Discover card show that the card was used three times on May 11; each transaction was a failed attempt to withdraw $500. Records for B.W.'s Bank of America card show three failed transactions for $503 each on May 11. B.W.'s Bank of America card was also used at a nearby 7-Eleven that same day in an attempt to complete a transaction for $202.95. Video surveillance at the 7-Eleven captured images of a white male wearing a brown jacket and a black hat, but the man's face was not visible.

"Records from a Days Inn & Suites in La Mesa show that Grizzle checked into the motel on May 10, 2016 and checked out on May 12, 2016. According to the registration papers, two adults stayed in the room. The car registered to the room was a Chevy Monte Carlo with the license plate number 7NNC272.

"On May 16, 2016, Sergeant Rick Turvey was involved in a high speed chase and eventually arrested the driver, Lawrence Johnson. Johnson was driving the same Monte Carlo registered by Grizzle at the Days Inn & Suites. When the Monte Carlo was processed for evidence, two folders were removed from the pocket of the front passenger seat. One of the folders contained hospital documents for someone named Rachelle Stewart.

"On May 19, 2016, Detective Dennis Josse was engaged in a high speed chase. The vehicle Josse was following eventually crashed, and the driver, Toren Nieber, was arrested. Detective Timothy Norris, who was investigating the Tommy Drive case, recognized Toren Nieber as the man captured on the U.S. Bank surveillance footage.

"On June 16, 2016, Grizzle was arrested while driving in the parking lot of The Suites motel in Las Vegas. Inside the car Grizzle was driving,

8

police found a keychain holding a key to a motel room as well as a key to a Volkswagen Jetta. There was a phone in Grizzle's pocket as well as an iPhone on the front passenger floorboard.

"The motel room matching the key in Grizzle's possession was registered under the name 'Karen Gonzalez.' A receipt found in the room had the name 'Gonzalez' on it. A female, Rachelle Stewart, was in the room.

"Officers found the Volkswagen Jetta close to the motel room. The car had a Nevada license plate. An investigation revealed that a man named Charles Elliot rented the car from Payless Car Rental in San Diego on May 12, 2016. At the time the car was rented, it had a valid California license plate. Payless reported the car stolen after it was not returned.

"After Grizzle was taken into custody and placed in Officer Brian Redsull's vehicle, he asked if the officers were from San Diego. Later, Redsull listened to a jail phone call between Grizzle and a woman. During the telephone conversation, Grizzle asked the woman how she knew that he had a warrant, and the woman explained that she checked two or three times a week. Grizzle said that he looked for the warrant as soon as he hung up but could not find it, and then 20 minutes later, he left the hotel room and 'they smashed me.'

"On January 5, 2017, Deputy Gregory Ward conducted a search of Grizzle's jail cell. He found a piece of paper with the name Charles Elliot written on it.

"Dutra performed DNA analysis on several items of evidence found at the crime scene. Reference samples were taken from Grizzle, Johnson, Nieber, B.A., B.W., S.P., Jesse, and W.S. Grizzle's DNA was found on several items in the Tommy Drive residence.

9

"For example, Grizzle's DNA was found on the mouth area of an open beer bottle on the kitchen counter. The bottle was two-thirds full. Grizzle's DNA also was found on the exterior of the bottle.[5] A black knit mask with eyeholes was found on the computer console in the front living room. Grizzle's DNA was found on the mask.[6] A glass pipe and green lighter were next to each other on a couch in the front living room. The pipe was the type of pipe used to smoke methamphetamine and appeared to have methamphetamine residue on it. DNA from Grizzle, Johnson, and Nieber was found on the pipe. Grizzle's DNA also was found on the lighter.

"In addition, a black glove was discovered in the street in front of a home, which was across the street and diagonal from the Tommy Drive residence. Grizzle's DNA was found on the glove as well as inside it.

"There was a Guess bag on one of the couches in the front living room. The Guess bag contained various items, including a box of disposable gloves and what appeared to be a used disposable glove. Grizzle's DNA was found on one of the disposable gloves.

"A plastic glove was found on top of a toolbox on the floor of the front living room. Grizzle's DNA was found on this glove.

"Finally, there was a bloodstain on the inside doorknob of the front door. A swab of the bloodstain indicated that the DNA came from a single individual, Grizzle. All the other individuals were excluded.

---

5    "An open beer bottle was found on the floor by the green recliner in the front living room. The bottle was two-thirds full. Nieber's DNA was found on the mouth area of the bottle."

6    "Initially, the computer running the analysis ran out of memory and could not interpret the results. As such, Dutra removed one of the DNA markers from the interpretation so that the computer would have to do fewer computations and an interpretation could be achieved."

"A criminalist extracted the telephone number and the carrier information from the iPhone found in the car Grizzle was driving when he was arrested. Sprint business records showed that the phone was registered to Mary Grizzle.

"From May 10 through May 19, all the location data for the cell phone was in the San Diego region. On May 11, three times between 1:00 and 3:00 p.m., the phone utilized a cell tower 500 feet from the Tommy Drive residence. Between 3:00 and 6:00 p.m., there were multiple cell site activations in the La Mesa/Lemon Grove area. From 6:00 to 9:00 p.m., there were no cell site activations. From 9:00 p.m. to midnight, there were multiple cell site activations in the National City area.

"The last cell site activation in San Diego was on May 19 at 4:46 a.m. After that, until May 23, all the cell site activations were in Buena Park (Orange County). On May 23, the phone activated a cell site in Lake Elsinore at 2:11 p.m. and a cell site in Corona at 9:42 p.m. On May 24 at 9:28 p.m., the phone activated a cell site in Nevada. On May 26 at 10:44 p.m., the phone activated a cell site in the Las Vegas metropolitan area.

"Defense

"The defense presented witnesses to impeach B.W. To this end, J.N. testified that she dated and was engaged to B.W. from 2009 through early 2015. In early 2011, she learned that B.W. was growing and selling marijuana with other individuals out of his rented home. She witnessed hundreds of marijuana plants in his house and materials for growing and cultivating the marijuana. She observed him selling the marijuana from the home in large quantities and having it shipped via FedEx to various locations. She also saw him at other locations where he was growing marijuana. B.W. continued the above efforts at least through 2014. During

11

2013 and 2014, B.A. joined B.W. in the business and J.N. saw them packaging and shipping marijuana together. J.N. also heard B.W. talking to Jesse about the marijuana business. B.W. told J.N. that he was still selling marijuana in 2015.

"J.N. also detailed various incidents of domestic violence by B.W. in 2014 and 2015. In one of the final incidents, B.W. told her that he was going to take all her belongings while physically hitting her. B.W. repeatedly threatened her and eventually took her possessions from the house they were living in. J.N. recorded several conversations with B.W. during which he violently threatened her, and those recordings were played for the jury. B.W. lied to the police about these incidents.

"I.S. testified that he was partnered with B.W. in a retail business from 2003 through 2013, but separated from B.W. because he learned that B.W. was growing and distributing marijuana, including shipping it with FedEx.

"Conviction

"A jury convicted Grizzle of felony murder (§§ 187, subd. (a), 189; count 1); two counts of first degree robbery in concert with two or more other people in an inhabited dwelling (§ 211; counts 2, 3); and burglary (§ 459; count 4). As to counts 2 and 3, the jury found true that the robbery occurred in an inhabited dwelling within the meaning of section 212.5, subdivision (a) and Grizzle committed the robbery voluntarily while acting in concert with two or more other people inside an inhabited dwelling within the meaning of section 213, subdivision (a)(1)(A). As to count 4, the jury also found true that the burglary occurred in an inhabited dwelling within the meaning of section 460 and another person other than an accomplice was present in the residence during the commission of the burglary within the meaning of section 667.5, subdivision (c)(21).

12

"In a bifurcated proceeding, Grizzle admitted he suffered probation denial priors (§ 1203, subd. (e)(4)), a prison prior (§§ 667.5, subd. (b), 668), and two prior strikes (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)).

"The trial court sentenced Grizzle to 159 years to life, consisting of: (1) 75 years to life plus 10 years for the serious felony priors for count 1; (2) 27 years to life plus 10 years for the serious felony priors for count 2; (3) 27 years to life plus 10 years for the serious felony priors for count 3. The court struck the prison prior and stayed the sentence on count 4 pursuant to section 654."

Additional Procedural History

Following Grizzle's direct appeal, we vacated the sentence and remanded the matter for resentencing to allow the superior court to resentence Grizzle consistent with changes to the law that amended sections 667, subdivision (a) and 1385 but otherwise affirmed the judgment.

On March 23, 2021, Grizzle filed a petition for resentencing under section 1172.6. The court appointed counsel to represent Grizzle, and the People filed an initial response to Grizzle's petition. On June 9, 2021, Grizzle filed a reply to the People's response. The same day, the trial court found that Grizzle made a prima facie showing, and it issued an order to show cause.

At the evidentiary hearing on October 15, 2021, the trial court noted that the prosecution bore the burden of proving beyond a reasonable doubt that Grizzle was ineligible for resentencing. It denied Grizzle's petition, finding that the People proved beyond a reasonable doubt that Grizzle was a major participant in the underlying felonies, and he acted with reckless indifference to human life.

13

In reaching this conclusion, the court gave great weight to the factors detailed in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).  It detailed each factor individually, applied it to the facts of Grizzle's case and concluded Grizzle was "not eligible for vacatur for his murder conviction."

Grizzle timely appealed.

## II.

## DISCUSSION

### A.  Senate Bill No. 1437 and Senate Bill No. 775

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) was enacted to " 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)  Senate Bill 1437 did this by amending section 188, which defines malice, and section 189, which defines the degrees of murder.  (Stats. 2018, ch. 1015, §§ 2 & 3.)  Amended section 188 states: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)  Amended section 189 states: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1)  The person was the actual killer. [¶] (2)  The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the

14

actual killer in the commission of murder in the first degree. [¶] [or] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Senate Bill 1437 also established resentencing relief for eligible defendants. (§ 1172.6, subd. (a); *People v. Strong* (2022) 13 Cal.5th 698, 707-708.) Under subdivision (a), "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition" with the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts "when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019" under Senate Bill 1437. After receiving a petition containing the required information, "the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*Strong*, at p. 708, citing § 1172.6, subd. (c).) If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subds. (c), (d)(3).)

Effective January 1, 2022, Senate Bill No. 775 (2020-2021 Reg. Sess.) (Senate Bill 775) amended section 1172.6 to clarify certain aspects of the law, including that (1) the burden of proof at a resentencing hearing under this

15

section is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under California law as amended by Senate Bill 1437 and (2) "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); see also Stats. 2021, ch. 551, § 1, subd. (c).)

### B. The Trial Court Acts as an Independent Factfinder

We first address Grizzle's contention that section 1172.6 does not place the trial court in the role of an independent factfinder and instead requires the People to prove beyond a reasonable doubt that the jury made factual findings necessary for conviction under current law.

The interpretation of a statute is a question of law, subject to de novo review. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) We give words their "plain and commonsense meaning" absent a special meaning provided by the statute itself. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 577-578.) If the statutory text "is unambiguous and provides a clear answer, we need go no further." (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758.) When the language supports more than one reasonable construction, we may look to extrinsic aids like legislative history and ostensible objectives in evaluating the meaning. (*People v. Cole* (2006) 38 Cal.4th 964, 975.)

Grizzle contends that the absence of a specific reference to whom the People must prove their case means "whatever [evidence] the prosecutor chooses to rely on, the prosecutor must show beyond a reasonable doubt that *the jury* found one of the required elements under section 189, subdivision (e), if the defendant was convicted of first degree felony murder." Not only is this inconsistent with the defense attorney's comment to the court at the evidentiary hearing that the hearing was "essentially a bench trial that

16

starts with the presumption of innocence and requires proof of each element beyond a reasonable doubt," but it is nonsensical in the context of the statute and in light of Senate Bill 775.

As we explained in *People v. Basler* (2022) 80 Cal.App.5th 46 (*Basler*),[7] section 1172.6 permits presentation of new and additional evidence at the evidentiary hearing, and it places on the People the burden to show a defendant is not eligible for resentencing. Because it is the People's burden to present evidence of the elements of murder that make a defendant guilty under current law, factfinding is a necessary part of the hearing. (*Basler*, at p. 61.) Because new evidence could not have been the basis for a jury finding, the statute cannot limit the People to proving only what the jury found.

Moreover, restricting the lower court's review to what the jury in the original trial found would amount to an appellate standard. (*People v. Clements* (2022) 75 Cal.App.5th 276, 294-295 (*Clements*).) That is inconsistent with the Legislature's express repudiation of a substantial evidence standard to evaluate whether the People meet their burden of proof at the evidentiary hearing. (§ 1172.6, subd. (d)(3) ["A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing"]; see *Basler*, *supra*, 80 Cal.App.5th at p. 61.) "If the Legislature had intended trial judges to review the record of conviction and grant relief only in an absence of substantial evidence to support a still-valid theory, they knew how to enact that standard and would have done so explicitly." (*Clements,* at p. 295.)

---

7    We published *Basler* on May 25, 2022, after Grizzle filed his opening brief but before he filed his reply brief. Grizzle did not discuss this case in his briefing.

We also reject Grizzle's contention that the court acting as a factfinder violates his constitutional right to a jury trial. As we explained in *Basler*, Grizzle "is not a defendant charged anew with murder and constitutionally entitled to a jury trial." (*Basler*, *supra*, 80 Cal.App.5th at pp. 61-62.) Section 1172.6 petitioners have already been convicted of murder, and their convictions are final; "[t]he termination or suspension (by whatsoever means effected) of any law creating a criminal offense does not constitute a bar to the indictment or information and punishment of an act already committed in violation of the law so terminated or suspended, unless the intention to bar such indictment or information and punishment is expressly declared by an applicable provision of law." (Gov. Code, § 9608.) Grizzle was properly convicted of murder under the law in effect at the time he participated in the robbery and burglary. "Section [1172.6] is 'an act of leniency' that requires, under specified circumstances, reduction of the offense for which he was properly convicted. The constitutional right to a jury trial does not require a jury determination in those circumstances." (*People v. James* (2021) 63 Cal.App.5th 604, 609.) In other words, an act of lenity like the one provided by Senate Bill 1437 does not implicate Grizzle's Sixth Amendment rights. (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156-1157.)

Here, the court acted as an independent factfinder at the evidentiary hearing at which it concluded the People proved beyond a reasonable doubt that Grizzle acted as a major participant in robbery and burglary, and he did so with a reckless indifference to human life. Thus, it complied with the statutory requirements set forth in section 1172.6.

C. Substantial Evidence Supports the Petition Denial

Grizzle contends that he is not ineligible for relief on the basis of the felony-murder conviction because insufficient evidence supports the trial

18

court's conclusion that he acted as a major participant with a reckless indifference to human life based on factors detailed in *Banks* and *Clark*.

We review the trial court's finding on the question of whether a defendant committed a murder under a still-valid theory for substantial evidence. (*Clements, supra,* 75 Cal.App.5th at p. 298.) We analyze the record in the light most favorable to the trial court's finding and determine if there is sufficient substantial evidence to find the defendant guilty beyond a reasonable doubt. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.) In so doing, we examine the entire record in the light most favorable to the judgment, looking for reasonable, credible evidence of solid value that would support a rational trier of fact in finding the defendant guilty beyond a reasonable doubt. (*Clements,* at p. 298; *People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements,* at p. 298.) We will not reverse the petition denial unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of

19

fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

### 1. Grizzle Was a Major Participant

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major." ' " (*Clark*, *supra*, 63 Cal.4th at p. 611.) To assist in answering this question, the California Supreme Court in *Banks* articulated the following considerations: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

Substantial evidence supports several of these factors. Grizzle invaded the Tommy Drive residence in a group of three to five men entering single file, with the person in front immediately pointing a gun in S.P.'s face. He left behind a black knit mask with eyeholes on the computer console in the front living room, as well as a black glove in the street in front of the home, a box of disposable gloves in a bag on a couch in the front living room that contained a used disposable glove, and a plastic glove on top of a toolbox on the floor of the front living room. Police tied these items to Grizzle through

DNA.  The manner of entry and the type and number of items left behind both indicate advanced planning, as well as ongoing presence at the crime scene.

Evidence also supports the conclusion that Grizzle was aware of the dangers posed by the crime and of the weapons used.  He was present when the intruders entered the home forcefully, one pointing a gun at S.P.'s face.  He was also present when B.W. arrived home and the intruders put a gun to his head and ordered him to the ground, then hit him on the back of the head with a gun and placed a T-shirt over his face.  And Grizzle's blood was found on the inside doorknob of the front door, suggesting he participated in a physical struggle.  Cell phone data placed him at the Tommy Drive residence over the course of several hours, and DNA evidence on a glove placed him at the computer desk sorting through papers, where he would have seen two victims on the ground tied up.  Witnesses testified they heard the intruders rummaging and ransacking, and Grizzle's DNA was found on a methamphetamine pipe and the mouth of a beer bottle, indicating he was in common areas with the other intruders and aware of the violence occurring.  His presence at the scene throughout the incident suggests he could have deescalated tensions but chose not to.

Moreover, Grizzle's conduct "after the lethal force was used" (*Banks*, *supra*, 61 Cal.4th at p. 803) also supports the finding he was a major participant.  Not only did he not render aid to the murder victim, but he also left behind S.P. and B.W., still bound with their faces covered.  (See *id.* at p. 807 [noting the defendant "did not see the shooting happen . . . and could not do anything to . . . render assistance"].)

Grizzle's presence at, and participation in, the underlying felony supports the trial court's finding that he was a major participant.  (See

21

*Banks*, *supra*, 61 Cal.4th at p. 805 [finding, by contrast, that the defendant was not a major participant in a robbery felony murder because he was absent from the scene during the robbery and the murder].) Because substantial evidence supports the court's conclusion, whether the remaining considerations are neutral or favor Grizzle has no effect here. (See *id.* at p. 803 [no single consideration necessary; no one consideration necessarily sufficient; all may be weighed].)

### 2. Grizzle Showed Reckless Indifference to Human Life

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*), brackets in original.)

In *Clark*, *supra*, 63 Cal.4th 522, the California Supreme Court articulated the following considerations for determining whether a defendant acted with reckless indifference to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he

22

or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, at pp. 618-623].)

The factors for evaluating reckless indifference " 'significantly overlap' " with several factors defining a major participant, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.) As with the major participant factors, " '[n]o one of [the reckless indifference] considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id*. at p. 618.) "We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life." (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The United States Supreme Court has "stressed the importance of presence to culpability." (*Clark*, *supra*, 63 Cal.4th at p. 619, citing *Tison v. Arizona* (1987) 481 U.S. 137, 158.) Where "the murder is a culmination or a foreseeable result of several intermediate steps . . . , 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state . . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark*, at p. 619.)

23

Considering the totality of the circumstances, we conclude substantial evidence supports the court's conclusion here. As we detailed *ante*, Grizzle was present for and participated in the burglary and robbery over the course of several hours. Witnesses heard the intruders ransacking the house and taking the TV off the wall of the back living room. The intruders took S.P.'s cell phone and the keys to his car, and they took B.W.'s credit cards, identification, the keys to his Cadillac Escalade, and his cell phone. Police found materials from the home gathered up, including a garment bag full of clothes on the couch in the back living room, a pillowcase containing plastic baggies of marijuana, a cell phone, an iPad, and several credit cards. Grizzle was present for all of it.

Additionally, the record supports a reasonable inference that Grizzle did not intervene to prevent the murder. He did not render aid at the scene to the murder victim, who intruders left lying face down in a pool of blood, and he did not help the robbery victims, who were left tied up inside. (See *Clark*, *supra*, 63 Cal.App.4th at p. 619 [noting the United States Supreme Court and "[o]ther appellate courts have considered relevant a defendant's failure to provide aid while present at the scene"]; *Scoggins*, *supra*, 9 Cal.5th at p. 672 [finding no reckless indifference where, "[a]fter the shooting, [the defendant] walked over to [the victim] and checked if he was still breathing," and then remained at the scene and was "cooperative" with law enforcement].) These considerations strongly support a finding Grizzle acted with reckless indifference to human life.

The duration of the felony also weighs against Grizzle. After he entered the Tommy Drive residence and S.P. was subdued, the intruders ransacked the home. The evidence supports a conclusion that Grizzle took

24

the time to drink beer and smoke methamphetamines.  This was a prolonged robbery, during which the intruders waited for B.A. to arrive.

There is no evidence that Grizzle had knowledge of factors bearing on his cohorts' likelihood of killing, but he was aware they brought a weapon, which they were using.  He heard the threats made to B.W., which evidenced escalating violence.  He was present for the struggle with B.A., and his blood at the scene suggests he engaged in some violence himself.  Even if he did not, he did not take any steps to diffuse the situation or minimize the risks of violence.

In sum, "nonkiller felony murderers fall on a continuum, a spectrum of culpability." (*Banks*, *supra*, 61 Cal.4th at p. 811.)  We are satisfied that substantial evidence supports the trial court's conclusion that Grizzle was a major participant in the underlying felony who acted with reckless indifference for human life.  Accordingly, the court did not err in denying his petition for resentencing under section 1172.6.

DISPOSITION

The order denying Grizzle's petition for resentencing under section 1172.6 is affirmed.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

25